416 S.E.2d 55 (1992)
STATE of West Virginia ex rel. MORGAN STANLEY & CO., INC.; Goldman Sachs & Co.; and Chase Securities, Inc., Defendants Below, Petitioners,
v.
Honorable A. Andrew MACQUEEN, Judge of the Circuit Court of Kanawha County, Respondent, and
The State of West Virginia, Petitioner Below.
No. 20857.
Supreme Court of Appeals of West Virginia.
Submitted February 4, 1992.
Decided March 19, 1992.
Rehearing Denied March 23, 1992.
*56 Robert B. King, Rebecca A. Betts, King, Betts & Allen, Charleston, for Morgan Stanley.
John C. Palmer, IV, Robinson & McElwee, Charleston, for Goldman Sachs.
Joseph R. Goodwin, Richard E. Rowe, Goodwin & Goodwin, Charleston, for Chase Securities.
WORKMAN, Justice:
Petitioners Morgan Stanley & Co., Inc., Goldman, Sachs & Co., and Chase Securities, Inc. (collectively referred to as petitioners) seek a writ of prohibition directing the Circuit Court of Kanawha County to disqualify the law firm of Wolff Ardis, which represents the State of West Virginia (the "State"), from further involvement in the underlying litigation. Petitioners contend that complete disqualification is necessary due to the conflict of interest which arose when Wolff Ardis undertook to represent simultaneously both the State as plaintiff in the underlying causes of action and certain former and/or current employees of the State Treasurer's office.
The employees in question, while not named parties to the lawsuit, may be considered to have been charged with wrongdoing in the underlying complaints in that the Treasurer's staff is accused collectively by the State of conspiring and acting in concert with petitioners to harm the State and its citizens. We conclude that a potential conflict of interest is presented by the dual representation of the State and the Treasurer's office employees undertaken by Wolff Ardis. This conclusion is based on the pleadings as framed at the time this case was submitted for decision on the writ of prohibition issue. At the oral argument of this petition, however, the State represented that it was prepared to amend its complaints to exclude specific allegations of wrongdoing against the individuals whom Wolff Ardis has undertaken to represent. Accordingly, if the pertinent pleadings are amended to exclude allegations which implicate the Treasury staff employees, either directly or indirectly, Wolff Ardis may choose to represent either the State or the staff employees, but it cannot continue to represent both entities. The requested writ of prohibition is hereby granted as moulded.
Petitioners are each defendants in civil actions pending before the Circuit Court of Kanawha County[1] initiated by the State to *57 recover investment losses allegedly sustained by the West Virginia Consolidated Fund (the "Fund") in the spring of 1987. Wolff Ardis is a Memphis, Tennessee, law firm which the State Attorney General appointed as "Special Assistant Attorneys General" for the purpose of initiating civil claims against the petitioners in connection with the investment losses sustained by the Fund.
The pleadings at the time this petition was filed alleged that the Treasurer's office was directly responsible for the day-today operations of the Fund during the time period relevant to the underlying civil action and that the losses realized by the Fund were caused by members of the Staff of the West Virginia State Treasurer's Office (the "Staff"). Only three individuals are named personally as defendants in the underlying civil actions: Kathryn Lester, Arnold Margolin, and A. James Manchin. In those complaints, however, the State uses the term "Staff" to refer collectively to Lester, Margolin, and Manchin, as well as the people employed by them. The State expressly charges that the Staff engaged in wrongdoing in connection with various securities transactions. Specifically, the State accuses the staff members of conspiring with petitioners, breaking state and federal law, lying, falsifying documents, violating fiduciary duties, and otherwise harming the State.
In addition to representing the State in the underlying civil actions, Wolff Ardis undertook to represent seven individuals who were employees of the Treasurer's office during the pertinent time period.[2] Although the record does not set forth the manner in which Wolff Ardis came to represent these seven staff members, the State maintained during oral argument that Wolff Ardis volunteered its services to these individuals following the Staff members' receipt of deposition notices. These individuals were deposed as nonparty witnesses.
Petitioners allege that Wolff Ardis has created an irreconcilable conflict of interest by virtue of its dual representation of both the State and the Staff members. The only remedy for this conflict, according to petitioners, is disqualification of Wolff Ardis from any further involvement in the underlying litigation. The parties concur that the alleged conflict was not present when the respective complaints were filed in 1989 and 1990 in the underlying two civil actions. Petitioners first became aware of the alleged conflict when they learned on July 17, 1991,[3] that Wolff Ardis intended to represent certain Staff employees at their depositions. On September 25, 1991, petitioners moved the trial court to disqualify Wolff Ardis based on the alleged conflict of interest. The circuit court heard argument of counsel on the motion to disqualify on October 3, 1991, and at the conclusion of that hearing denied petitioners' motion. On November 22, 1991, petitioners filed a petition with this Court seeking a writ of prohibition[4] to disqualify Wolff Ardis from the underlying litigation.
Before proceeding to determine whether in fact a genuine conflict is present here, it is helpful to review relevant facts regarding the trading activities undertaken by the State Board of Investments (the "Board") on behalf of the Fund in the years 1985 through 1987. During that time period, the Staff actively managed the Fund and *58 employed a strategy of buying and selling intermediate and longer-term United States Government Securities in a manner calculated to maximize earnings. In its role of in-house manager of the Fund, the Staff actively traded United States Government Securities with dozens of different primary dealers, both banks and brokers. Each trading transaction was authorized by a Staff member.[5] Petitioners allege that all decisions regarding the amount, timing, and identity of each purchase and/or sale of securities were made by the Staff. The State, on the other hand, takes the position that petitioners were actively involved in advising the Staff regarding specific transactions.
The active management strategy of the Staff produced hundreds of millions of dollars in profits during 1985, 1986, and the early part of 1987. In the spring of 1987, however, the Fund experienced significant losses. The underlying lawsuits, filed in 1989 and 1990, are predicated on allegations of fraud and breaches of common-law and statutory duties purportedly owed to the State by both the petitioners and the Staff. In the underlying complaint, the State accuses petitioners of encouraging and facilitating the Staff's allegedly unlawful conduct. In those complaints, the term "staff" is defined to include "Lester, Margolin, Manchin and people employed by them." The complaints at issue charge that the Staff engaged in the following acts of wrongdoing:
1. The Staff "combined and conspired" with petitioners "to commit unlawful acts in a lawful manner, to commit lawful acts in an unlawful manner, and/or to commit unlawful acts in an unlawful manner."
2. "[T]he Staff had kept its activities and the resulting losses concealed by hiding and falsifying records and through misleading and untrue statements regarding the nature and results of their activities."
3. "[T]he Staff was acting ultra vires."
4. The Staff was "assisted, aided, abetted, and induced to breach its statutory and fiduciary duties."
5. The Staff engaged in "excessive, unauthorized and unsuitable trading ... in violation of applicable State investment statutes and guidelines, State common law [and] federal and state securities laws and regulations."
6. The Staff participated with petitioners in "ignoring the nature of the Fund as one which was supposed and intended to be conservatively managed."
Rule 1.7 of the Rules of Professional Conduct sets forth the general rule regarding conflicts of interest. That rule provides, in pertinent part, that:
(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
(2) each client consents after consultation.
Because the State is an organization, rather than an individual, we must also examine Rule 1.13, which sets forth separate rules to address additional issues which may arise when the client is an organization. Rule 1.13(e) provides that:
A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders.
A prerequisite to establishing a conflict of interest pursuant to Rule 1.7(a) of the Rules of Professional Conduct is evidence that an attorney's representation of one client is directly adverse to another client. *59 Petitioners contend that the allegations in the State's complaints in the underlying civil actions create the requisite direct adversity between the State and the Staff. Petitioners reason that because each of the transactions at issue was effected at the direction and under the control of the Staff, the State can only prove its case by first establishing that the Staff members (some of whom Wolff Ardis represents) violated the law. Petitioners contend further that the paramount element of direct adversity does not require that the Staff members be sued as individual defendants.
While recognizing that representation may proceed in certain situations notwithstanding a conflict of interest provided each client consents to the representation, petitioners argue that continued representation is not permitted when one of the clients involved is the State. Relying on an opinion of the Committee on Legal Ethics of the West Virginia State Bar, petitioners assert that under no circumstances may the State consent to a conflict of interest:
While a private attorney may obtain the consent of his clients to represent them even when their interests conflict, an attorney representing the public cannot obtain similar consent. See ABA Committee on Professional Ethics, Opinions, No. 16 (1929) and No. 34 (1931). Therefore, an attorney representing the public may proceed with his public or private representation only in the absence of any conflict of interest.
Legal Ethics Inquiry 84-0 [84-01] at 2. As additional support for their position, petitioners cite Graf v. Frame, 177 W.Va. 282, 352 S.E.2d 31 (1986), a decision in which this Court recognized that when "the public interest is involved, an attorney may not represent conflicting interests even with the consent of all concerned." Id. at 38.
The State, in its defense to the requested writ of prohibition, argues first that it has no intention of bringing suit against the Staff members represented by Wolff Ardis. The State continues its argument by contending that because the Staff members whose representation is at issue are not and never will be named parties to the underlying causes of action, the requisite element of direct adversity necessary for a conflict of interest pursuant to Rule 1.7(a) is missing. The State argues further that "Defendants' disqualification tactic is merely a last-ditch attempt to forestall the upcoming trial."
While we recognize that a disqualification motion "should be viewed with caution,... for it can be misused as a technique of harassment[,]" we do not find that to be the case here. See commentary, W.Va.R.Prof.Conduct 1.7. To bolster its position that the disqualification motion is a tactical move, the State faults the petitioners for filing the disqualification motion near the end of the discovery deadline. This fact, however, cannot be viewed in a vacuum. Unlike the situation when a conflict of interest presents itself from day one of the case, it appears that petitioners had no way of knowing before July 17, 1991,[6] that Wolff Ardis would create a potential conflict by agreeing to represent the seven Staff members at their depositions. Consequently, petitioners cannot be faulted for not raising the conflict issue at an earlier point in the lawsuit. But see Stanwood Corp. v. Barnum, 575 F.Supp. 1250 (W.D.N.C.1983) (disqualification motion denied where defendant waited until the case was five months old to raise potential conflict). We find that petitioners moved with sufficient alacrity in requesting disqualification within two months of their discovery of the dual representation undertaken by Wolff Ardis. The record in this case simply does not confirm the State's theory that petitioners filed the disqualification motion merely as a tactic of delay or harassment.
Furthermore, we are not convinced by the State's argument that the required element of direct adversity is nonexistent because "[t]he State has not sued those people [the seven Staff members], has not threatened to sue those people, and has never contemplated suing those people." Being named as a party to a lawsuit is not a prerequisite to creating the direct *60 adversity element needed to establish a conflict under Rule 1.7(a). Adverse interests may arise between entities independent of their involvement as parties to a lawsuit. See Chateau de Ville Productions, Inc. v. Tams-Witmark Music Library, Inc., 474 F.Supp. 223 (S.D.N.Y.1979) (court refused to permit counsel to represent both plaintiffs and an alleged but unnamed co-conspirator based on adversity of interests);[7]see also In Re Gopman, 531 F.2d 262 (5th Cir.1976) (disqualification upheld which prohibited counsel for several labor unions from representing certain union officials who were not even targets of grand jury investigation at issue). The critical issue is the existence or potentiality of conflicts of interest and not the inclusion of all adverse parties in a lawsuit.
Although the State does not name the seven Staff members as actual defendants in the underlying litigation, the pleadings, as framed at the time this case was argued, do potentially implicate these individuals with the alleged wrongdoing in connection with the investment losses at issue. That implication, in and of itself, is sufficient to raise the necessary element of adverse interests. The allegations against the Staff, although asserted collectively rather than individually, nonetheless create potential adverse interests between the State and those individual Staff members, which in turn further create a potential, if not actual, conflict of interest. To permit Wolff Ardis to represent both the State and the individual Staff members in the framework of pleadings containing such allegations would clearly be in violation of the Rules of Professional Conduct. Accordingly, we hold that pleadings drafted by the plaintiffs which categorically or collectively refer to certain individuals in connection with specific allegations of wrongdoing but fail to include these individuals as named defendants can nonetheless contribute to a finding of adverse interests within the meaning of Rule 1.7 of the Rules of Professional Conduct sufficient to disqualify a law firm from representing both the plaintiffs and the unnamed individuals.
The State argues alternatively that if there is a conflict, Wolff Ardis can nonetheless proceed to represent the seven Staff members because each individual consented to the representation. See W.Va.R.Prof.Conduct 1.7, 1.13. What the State fails to grasp is that the consent required by Rules 1.7 and 1.13 is that of the individuals and the State. And as the petitioners point out, the State is incapable of granting its consent. We reach this conclusion based on Legal Ethics Inquiry 84-01 in conjunction with our previous statement in Graf that "where the public interest is involved, an attorney may not represent conflicting interests even with the consent of all concerned." 352 S.E.2d at 38. The rationale underlying this rule is quite simple: "It is essential that the public have absolute confidence in the integrity and impartiality of our system of justice." Id. Implicit within this ideal is the ethical requirement that attorneys must "avoid, as much as is possible, the appearance of impropriety." Id. Given the obvious public interest inherent in the State's pursuit of its claim for investment losses, the State cannot consent to a dual representation which involves such adversity of interests as to raise even the appearance of such impropriety. See also Guthrie Aircraft, Inc. v. Genesee County, N.Y., 597 F.Supp. 1097, 1098 (W.D.N.Y.1984) ("[A] municipality may not consent to adverse representation, since the public interest is involved"); In re A. and B., 44 N.J. 331, 209 A.2d 101, 102-103 (1965) ("Dual representation is particularly troublesome where one of the clients is a governmental body. So, an attorney may not represent both a governmental body and a private client merely because disclosure was made and they are agreeable that he represent both interests.").
*61 Once allegations against the nonparty Staff members are removed from the investment lawsuits, the direct adversity element is eliminated and the conflict created by the dual representation will vanish. Provided that the State carries through with its represented willingness to amend its complaints to remove any allegations against the unnamed seven Staff members, it appears unnecessary to disqualify Wolff Ardis from representing both the State and the Staff members in the underlying litigation. We make this determination mindful of the fact that "[d]isqualifying an attorney from representing a client is ... inimical to the client's right to counsel of his or her choice." Graf, 352 S.E.2d at 38.
Petitioners argue that absent complete disqualification, confidential information to which Wolff Ardis gained access through its representation of the seven Staff members will be subject to improper use or disclosure. Upon examination, however, what petitioners are really complaining about is the State's use of the attorney/client privilege[8] during the depositions of certain Staff members. When questioned by petitioners at their depositions regarding altered statements, at least two Staff deponents admitted that the changes were prompted by listening to audio recordings of securities transactions during preparation for their depositions.[9] Much of petitioners' argument for complete disqualification is grounded in their inability to discover during the depositions of these deponents, due to the State's assertion of the attorney/client privilege, which specific tapes or trades caused the particular deponents to change their statements.
We note initially, and petitioners concede this point in a footnote in their brief, that the information sought by petitioners was most likely discoverable through Rule 612(b) of the West Virginia Rules of Evidence.[10] There is nothing in the record, however, to indicate that petitioners sought such material pursuant to Rule 612(b). Consequently, they are not in a good position to complain about their failure to obtain information which they had at their disposal under Rule 612(b). That rule of evidence appears to require the State to identify the relevant tapes to permit petitioners to locate the specific trades or other information which the deponents used to refresh their recollection.[11]
It appears that petitioners' true concern is the possibility that Wolff Ardis, through its dual representation, has gained access to information which it will use against petitioners. Although we concede this could have happened, or that Wolff Ardis may have been in a position by virtue of the attorney-client relationship to have shaped the deposition testimony of the nonparty staff in an unfair manner, petitioners have failed to present any evidence which demonstrates a harmful impact upon their own interests sufficient to prevent Wolff Ardis from representing either the State or the Staff members, but not both. See Charles W. Wolfram, Modern Legal Ethics § 7.1 (1986) (standing to assert conflict of interest requires proof of material harm to complaining party's cognizable interest). Given petitioners' reliance upon the State's assertion of the attorney/client privilege almost exclusively in the context of inquiries *62 concerning the basis for nonparty witnesses' changed statements coupled with the fact that petitioners apparently failed to utilize the rules of evidence to obtain the requested information, we find that petitioners have not met their burden of demonstrating that their interests would be harmed by permitting Wolff Ardis to continue its representation in the capacity which we have previously outlined.
Our ruling in this case should not be construed as requiring tangible evidence of material harm to justify disqualification in every case. Clearly, in some cases the facts, in and of themselves, tend to require complete disqualification based merely on the potential for harm caused by the presumed disclosure of confidential information. This case, on neither its facts nor its procedure, presents such a grave situation. As petitioners essentially admit, their real objection is to the State's opportunity to influence the testimony of certain Staff members rather than a specific concern that confidentially relayed information will be misused or disclosed. Accordingly, given the proximity of this litigation to trial, the State's willingness to amend its complaints, and petitioners' failure to prove that Wolff Ardis' continued representation of either the State or the Staff members would materially harm their interests, we do not deem complete disqualification necessary. In the event that the State fails to further amend its complaints, however, we would be inclined to grant the writ of prohibition to prevent Wolff Ardis from any further involvement in the underlying litigation.
Based on the foregoing opinion, we hereby grant the writ of prohibition as moulded.
Writ granted as moulded.
NOTES
[1] Morgan Stanley & Co., Inc. and Goldman, Sachs & Co. are defendants in State of West Virginia v. Morgan Stanley & Co., Inc., et al., Civil Action Number 89-C-3700, and Chase Securities, Inc. is a defendant in State of West Virginia v. Chase Securities, Inc., Civil Action Number 90-C-2083.
[2] Those seven individuals are Mary Hudson Rivera, Jerry Simpson, Dianna Will, Mary Jane Lopez, Jack Fuller, Rockland Poole, and Dorothy Gillispie.
[3] It appears from the record that the first nonparty witness, Mary Jane Lopez, was deposed on July 17, 1991. The State, in its brief, refers to the portion of the Lopez deposition transcript wherein Ms. Lopez identifies her counsel as Mary Wolff, to establish when petitioners were first advised of the dual representation undertaken by Wolff Ardis.
[4] As we explained in State ex rel. Taylor Assoc. v. Nuzum, 175 W.Va. 19, 330 S.E.2d 677 (W.Va. 1985), a writ of prohibition is the appropriate remedy to disqualify counsel from further participation in a law suit when a conflict of interest arises. The writ of prohibition at issue was filed pursuant to the original jurisdiction of this Court. See W.Va. Const. art. VIII, § 3; W.Va. Code §§ 53-1-1, 53-1-2 (1981).
[5] None of the trades at issue were accomplished through a method of trading known as discretionary, which involves the imposition of the trader's complete discretion in the broker, thereby giving the broker carte blanche to determine which trades to execute.
[6] See n. 3, supra.
[7] The State attempts to distinguish the Chateau de Ville case by arguing that the unnamed co-conspirator was actually a party to the lawsuit. While the State is technically correct, the State's argument is flawed because the co-conspirator was merely a third-party defendant on unrelated third-party claims"insofar as the aforementioned conflict is concerned, Music Fair [co-conspirator] is not a named party." 474 F.Supp. at 227 (emphasis supplied).
[8] While not dispositive of this case, we note that the commentary to Rule 1.13 of the Rules of Professional Conduct suggests that in the event adverse interests arise where there is dual representation, "discussions between the lawyer for the organization and the individual may not be privileged."
[9] Apparently, the trading room in which the Staff made trades was equipped with devices which recorded each and every trade.
[10] Rule 612(b) of the West Virginia Rules of Evidence provides that:

If, before testifying, a witness uses a writing or object to refresh his memory for the purpose of testifying and the court in its discretion determines that the interests of justice so require, an adverse party is entitled to have the writing or object produced, if practicable, at the trial, hearing, or deposition in which the witness is testifying.
[11] The State argues that because petitioners had access to the same audio tapes listened to by the Staff members during witness preparation, petitioners cannot claim that they did not have access to the information which caused or contributed to a particular individual's decision to change his/her statement.