433 S.E.2d 579

**COMMITTEE ON LEGAL ETHICS,**
Complainant,

v.

**Clark FRAME and J. Michael Benninger, Respondents.**

**No. 21627.**

Supreme Court of Appeals
of West Virginia.

Submitted June 1, 1993.

Decided July 22, 1993.

Sherri D. Goodman, Charleston, for complainant.

Clark B. Frame and J. Michael Benninger, pro se.

PER CURIAM:

The hearing panel of the Committee on Legal Ethics ("the Committee") has found that attorney Clark Frame violated Rule 1.7(a) of the West Virginia Rules of Professional Conduct through the following actions: (1) failing to understand the importance of client loyalty in determining whether a conflict of interest existed; (2) failing to discuss the issue of the conflict with either client once all facts were known; and (3) trying to rationalize away the conflict of interest when its acknowledgement was unquestionably inconvenient

to the law firm and to its client. The Committee recommends a public reprimand against Mr. Frame and that he be assessed the costs of the proceeding.

The Committee found that although attorney J. Michael Benninger was a party to the conflict in its final stages, he should not be disciplined due to his genuine attempts to alert his senior partners of the conflict. Having reviewed the record in this matter, we adopt the recommendations of the Committee and order public reprimand of Mr. Frame, costs of $840.20 assessed against Mr. Frame, and no further action against Mr. Benninger.

## I.

On August 10, 1988, Wesley Metheney, a member of the law firm of Wilson, Frame & Metheney in Morgantown, West Virginia, filed a civil action entitled *Baamonde, et al. v. Markwoods, Inc., dba J & J Home Sales* (hereinafter "Markwoods"). Mr. Baamonde alleged that he had injured his knee while walking up steps to inspect a mobile home on J & J Home Sales' lot. Mr. Baamonde sought $500,000 in damages and $100,000 loss of consortium damages for his wife. The summons and complaint were served on the Secretary of State and forwarded to Ms. Vickie Lynn McMillen, vice president and manager of the family-owned mobile home company, Markwoods. Ms. McMillen received these documents on August 16, 1988, and provided them to her local insurance agent that same day. Ms. McMillen had been employed by J & J Homes Sales since 1978, having become a majority stockholder in 1984 holding fifty-two percent of the outstanding shares.

Markwoods' insurer, Erie Insurance, retained Russell Clawges, Jr., to defend the action. Mr. Clawges contacted Ms. McMillen on August 24, 1988, and informed her of his representation. Mr. Clawges prepared an answer to the complaint and forwarded a copy of it to Ms. McMillen on September 1, 1988. Mr. Clawges spoke with her again on September 6, 1988. Ms. McMillen then had no further communication with Mr. Clawges from September 1988 through May 30, 1989. She did speak by telephone with an Erie representative and was allegedly advised that Erie would offer to settle the case for Mr. Baamonde's hospital and medical bills. Subsequent to that conversation, Ms. McMillen had no further contact with either Erie or Mr. Clawges and assumed that the lawsuit had been resolved.

In early 1989, Ms. McMillen contacted Mr. Frame regarding representation in a divorce action. During their initial consultation on March 7, 1989, Ms. McMillen discussed her interest in Markwoods and her concern that her husband not receive any portion of the company through the divorce. Although the evidence is unclear, there was apparently was some reference during that meeting to the Baamonde suit. Ms. McMillen testified that Mr. Frame asked her if his firm was suing the corporation. Ms. McMillen also testified that she had been under the impression that the matter had been settled and that she did not understand the significance of the discussion.

Mr. Frame assumed representation of Ms. McMillen and filed a divorce complaint on her behalf. In April and May 1989, Mr. Frame's representation of Ms. McMillen's divorce case included meeting with her on April 11 and April 25, receiving financial information, and scheduling a final hearing for June 8, 1989. Meanwhile, the Baamonde action was scheduled for pretrial conference on May 15, 1989, and Mr. Frame and Mr. Metheney were identified as trial counsel for the plaintiffs in a pretrial memorandum completed by April 26, 1989.

On June 1, 1989, Ms. McMillen met with Mr. Frame and learned that Mr. Frame had a criminal trial which conflicted with the scheduled June 8, 1989, divorce hearing. Mr. Michael Benninger then assumed representation of Ms. McMillen as substitute counsel. In preparation for the hearing, Mr. Benninger met with Ms. McMillen and her father, received additional financial information, and consulted with Ms. McMillen's accountant. Mr. Benninger also attended the final hearing on June 8, 1992, as Ms. McMillen's counsel.

Upon receipt of a motion for summary judgment on behalf of Markwoods, Mr. Metheney requested that Mr. Benninger research the legal issues raised in the motion. When Mr. Benninger noticed Ms. McMillen's affidavit, included within that motion for summary judgment, he realized that his firm was representing Ms. McMillen in her divorce while suing her corporation in a separate action. He also understood that she was going to appear as an adverse witness at the trial of the Baamonde action. Mr. Benninger researched the potential conflict question and conferred with Mr. Metheney and Mr. Frame. They concluded that there was no conflict of interest because their firm had sued the corporate entity rather than Ms. McMillen personally. They also concluded that they need not discuss the issue with either Ms. McMillen or the Baamondes since they perceived no conflict of interest.

On June 27, 1989, for reasons not now apparent to Ms. McMillen, she first realized that the firm representing her in the divorce action also represented a plaintiff suing her corporation. Ms. McMillen contacted Mr. Clawges on or about June 30, 1989, and complained of what she perceived to be a conflict of interest. On the day of the scheduled Baamonde trial, July 10, 1989, Mr. Clawges orally moved to disqualify the law firm of Wilson, Frame & Metheney based upon the alleged conflict of interest. The lower court denied the motion, ruling that no confidential information had been disclosed and that the motion was untimely. The trial proceeded, and the case settled within policy limits. Upon the conclusion of the proceedings, Ms. McMillen expressed her anger and sense of betrayal to Mr. Benninger and travelled to Kingwood to hire attorney Virginia Hopkins to substitute as counsel in the divorce action.

On September 15, 1989, Ms. McMillen filed an ethics complaint with the West Virginia State Bar. A hearing was held in this disciplinary matter on August 29, 1992, at the State Bar Center in Charleston, West Virginia, subcommittee member Rebecca A. Betts presiding. Based upon evidence submitted by Mr. Frame and Mr.

Benninger, pro se, as well as Ms. McMillen and Mr. Clawges, the subcommittee recommended sanctions against respondent Mr. Frame in the form of a public reprimand. Although Mr. Benninger was a party to the conflict in its final stages, the Committee recommended that he be subject to no further discipline.

## II.

Rule 1.7(a) of the West Virginia Rules of Professional Conduct provides as follows: "(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after consultation." The Respondents maintain that they had no duty to refrain from representation or obtain consent because no direct adversity existed between the two clients, Ms. McMillen and Mr. Baamonde. By definition, no violation of Rule 1.7(a) can occur if representation of one client will not be directly adverse to another client. With regard to the interpretation of the phrase "directly adverse," the comment to Rule 1.7(a) provides the following guidance:

> Thus, a lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only generally adverse, such as competing economic enterprises, does not require consent of the respective clients. Paragraph (a) applies only when the representation of one client would be directly adverse to the other.

The Committee maintains that the Respondents' representation of Mr. Baamonde in his personal injury lawsuit was directly adverse to Ms. McMillen in her capacity as a majority shareholder, corporate officer, and manager of Markwoods. The Respondents contend that although Ms. McMillen and Mr. Baamonde were on opposing sides of the personal injury action, the Respondents were not representing Ms. McMillen

in that personal injury action. They simply represented Ms. McMillen in a divorce action while representing Mr. Baamonde in an unrelated personal injury action. Mr. McMillen acknowledges that no information was disclosed or sought by the Respondents concerning the Baamonde case, and Ms. McMillen was also unable to identify any prejudice or misfortune resulting from the simultaneous misrepresentation. Ms. McMillen .did, however, appear as a witness in the Baamonde case regarding the general business of Markwoods and was cross-examined by Mr. Metheney of the Respondents' law firm.

The conclusive question is whether representation of one client was directly adverse to the other. As we explained in *State ex rel. McClanahan v. Hamilton,* 189 W.Va. 290, 430 S.E.2d 569 (1993)

> An adverse interest, also termed a conflict of interest, can occur in a variety of situations.... It is impossible to devise a single statement that will reveal whether an interest is adverse. The resolution of the issue rests on first determining whether a substantial relationship existed between the two clients' interests. Next, consideration should be given by the court as to whether the attorney's exercise of individual loyalty to one client might harm the other client or whether his zealous representation will induce him to use confidential information that could adversely affect the former client.

*Id.* at 294, 430 S.E.2d at 573.

In *Garlow v. Zakaib,* 186 W.Va. 457, 413 S.E.2d 112 (1991), we recognized that the comment to Rule 1.7 enumerates several relevant factors in determining whether the "directly adverse" requirement has been satisfied. These include the "duration and intimacy of the lawyer's relationship with the clients involved; functions performed by the lawyer; likelihood of actual conflict; and likelihood of prejudice." *Id.* at 462, 413 S.E.2d at 117. It is, as the comment explains, a question of " 'proximity and degree.' " *Id.*

We also addressed the "directly adverse" requirement in *State ex rel. Morgan Stan-*

*ley & Co., Inc. v. MacQueen,* 187 W.Va. 97, 416 S.E.2d 55 (1992). In that case, we recognized that being named as a party to a lawsuit is not a prerequisite to creating the direct adversity element needed to establish a conflict of interest. *Morgan Stanley* involved an attempt to disqualify a law firm based, in part, upon the provisions of Rule 1.7(a). The firm represented both the State and certain state employees in the State's action to recover investment fund losses. In finding that a conflict of interest existed, we also explained that "[t]he critical issue is the existence or potentiality of conflicts of interest and *not* the inclusion of all adverse parties in a lawsuit." *Id.* at 102, 416 S.E.2d at 60. Similarly, while Ms. McMillen was not personally named as a defendant in the Baamonde suit, her status as a majority shareholder of the named defendant corporation created a potential, if not actual, conflict of interest.

We agree with the Committee's findings that the Respondents' representation of Mr. Baamonde "was directly adverse to Ms. McMillen in her capacity as a majority shareholder, corporate officer, and manager of Markwoods, Inc." While the Respondents did not directly represent Ms. McMillen in the personal injury suit, they did represent Ms. McMillen in an unrelated divorce action; she was still their client, and Rule 1.7(a) still applies. The Respondents also appear to place great emphasis on the fact that no deleterious impact was actually created by the simultaneous representation. That begs the question. To establish an ethical violation under Rule 1.7(a), one does not have to prove prejudicial impact, negative result, or an exchange of confidential information. The only prerequisites for the establishment of an ethical violation are those clearly set forth in the rule itself; namely, representation of one client that is "directly adverse" to another client without the consent of each client. The "directly adverse" language does not imply that a bad result must occur before representation is impermissible. It is the interests of

the clients with which the rule is concerned, not the result obtained.[1]

In the present case, representation of Mr. Baamonde entailed cross-examination of Ms. McMillen. The Committee contends that direct adversity automatically exists when a lawyer's representation of one client entails cross-examination of an adverse witness who is also the lawyer's client.[2] In formal opinion 92–367, issued by the American Bar Association Committee on Ethics and Professional Responsibility, the Committee explained: "A lawyer who in the course of representing a client examines another client as an adverse witness in a matter unrelated to the lawyer's representation of the other client, ... will likely face a conflict that is disqualifying in the absence of appropriate client consent." ABA/BNA Lawyers' Manual on Professional Conduct § 1001: 149 (1993). The Committee concluded that a "lawyer's examining the lawyer's client as an adverse witness, or conducting third[-]party discovery of a client, will ordinarily present a conflict of interest...." The Committee opined that such examination or discovery is likely to create the following problems:

> (1) to pit the duty of loyalty to each client against the duty of loyalty to the other; (2) to risk breaching the duty of confidentiality to the client-witness; and (3) to present a tension between the lawyer's own pecuniary interest in continued employment by the client-witness and the lawyer's ability to effectively represent the litigation client.

The American Bar Association opinion also cites *Estates Theatres, Inc. v. Columbia Pictures Industries, Inc.*, 345 F.Supp. 93 (S.D.N.Y.1972), in which the court explained that an attorney should "not be permitted to put himself in a position where, even unconsciously, he will be tempted to 'soft pedal' his zeal in furthering the interests of one client in order to avoid an obvious clash with those of another." *Id.* at 99. The American Bar Association opinion further notes that cross-examination of a lawyer's own client could potentially jeopardize client confidences. "First, to the extent a lawyer's general familiarity with how a client's mind works is relevant and useful information, it may also be disqualifying information within the contemplation of Rule 1.8(b)...."[3] Second, the opinion explains that if the lawyer had acquired confidential information relevant to the cross-examination, the lawyer may overcompensate and fail to cross-examine fully and fail to adequately represent the litigation client.

■ We conclude that the simultaneous representation of Mr. Baamonde and Ms. McMillen, while fortunately resulting in no actual harm, presented such dangers as contemplated above and constitutes a violation of Rule 1.7(a). We have previously explained the following: "The ... [Rules of Professional Conduct] state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." Syl. Pt. 3, *Committee on Legal Ethics v. Tatterson*, 173 W.Va. 613, 319 S.E.2d 381 (1984). " 'This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law.' Syllabus Point 3, *Committee on Le-*

---

1. While the results of simultaneous representation are not dispositive of the determination as to whether an ethical violation has occurred, the fact that no negative consequences were suffered certainly merits consideration in our determination of the appropriate discipline for such violation.

2. Mrs. McMillen's status as majority shareholder, corporate officer, and manager of a corporation being sued should have alerted Mr. Frame to the adverse positions of the clients and the potential for having to cross-examine Mrs. McMillen.

The Committee's position is that the cross-examination presented actual evidence of the adverse element of the dual representation.

3. Rule 1.8(b) of the West Virginia Rules of Professional Conduct provides as follows: "A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client consents after consultation, except as permitted or required by Rule 1.6 [regarding revealing confidences to prevent commission of a crime or to establish a claim or defense on behalf of the lawyer] or Rule 3.3 [regarding a lawyer informing a tribunal of material facts enabling tribunal to make informed decision]"

*gal Ethics v. Blair,* [174] W.Va. [494], 327 S.E.2d 671 (1984)." Syl. Pt. 1, *Committee on Legal Ethics v. Charonis,* 184 W.Va. 268, 400 S.E.2d 276 (1990).

■ For their own protection from charges of ethical violations and in consideration of their clients' interests, attorneys should remain mindful of actual or potential conflicts of interest resulting from simultaneous representation. Any doubt regarding whether a conflict exists should be resolved in favor of informing the client(s) of the concerns and allowing the client(s) an opportunity to consent to continued representation or to seek new counsel.

The Committee found that the Respondents in the present case exercised poor judgment.[4] To the extent that the Respondents could have averted this disciplinary proceeding by assuring that Ms. McMillen and Mr. Baamonde understood and approved of the relationship between the Baamonde's suit and the Respondents' law firm, we agree. We adopt the findings and recommendation of the Committee and hereby order a public reprimand against Mr. Frame and further order that the costs of this proceeding be assessed against him.

Public reprimand ordered.

NEELY, Justice, dissenting:

The majority accurately sets out the standard for determining whether representation of one client is directly adverse to another: the duration and intimacy of the lawyer's relationship with the clients involved; the functions performed by the lawyer; the likelihood of actual conflict; and the likelihood of prejudice. If Ms. McMillen were a named party in the Baamonde action, the case against Mr. Frame would be unassailable.

Ms. McMillen is in fact two steps removed from the arena of the Baamonde case: the real party in interest in that case was not Ms. McMillen and was not the corporation in which Ms. McMillen owns a controlling interest, but rather the corporation's insurer. Under the unity of interest doctrine, there is no representation of a client "directly adverse" to another client where, as here, the suit is against a corporation's insurer and not against the individual or the corporation the individual owns in terms of whose ox will actually be gored.

When Ms. McMillen retained Clark Frame as her divorce lawyer, Mr. Frame informed her of his representation in the Baamonde matter. Ms. McMillen expressed no concern. Ms. McMillen obviously retained Mr. Frame because he is among the foremost lawyers in West Virginia and has a reputation for representing clients aggressively and successfully. Had Mr. Frame failed to disclose to Ms. McMillen the posture of the cases while actually aware of the possible conflict, his actions would deserve sanction. Had Ms. McMillen (who was soon if not immediately armed with full knowledge of the nature of both actions), registered an objection during months of continued contact with Mr. Frame, her case would be more plausible. Instead, Ms. McMillen gets this ridiculous opportunity to act out because, obviously, she did not get what from her perspective would have been a perfect result in her divorce action. Meanwhile the escutcheon of a highly-regarded lawyer in this state is needlessly besmirched.

---

**4.** We emphasize that neither this Court nor the Committee assigns any unethical intent to Mr. Frame in this matter. As the Committee pointed out, the incident is an example of poor judgment rather than malicious or deceptive intent.

We therefore attribute no improper motive to Mr. Frame or any member of his law firm.