600 S.E.2d 256

**Hubert J. BAREFIELD, Plaintiff,**

v.

**DPIC COMPANIES, INC., Defendant.**

**No. 31226.**

Supreme Court of Appeals of West Virginia.

Submitted: Sept. 23, 2003.

Filed: June 25, 2004.

Davis, J., concurred and filed separate opinion.

Maynard, C.J. concurred in part and dissented in part and filed separate opinion.

Albright, J., concurred and filed separate opinion.

relations proceeding.

Jeffrey V. Mehalic, Esq., Charleston, for Plaintiff.

Paul T. Farrell, Jr., Esq., Wilson, Frame, Benninger & Metheney, PLLC, Morgantown, Michael J. Romano, Esq., Romano Law Office, Clarksburg, for Amicus Curiae West Virginia Trial Lawyers Association.

Gerard R. Stowers, Esq., Ronda L. Harvey, Esq., Rochelle L. Glover, Esq., Bowles, Rice, McDavid, Graff & Love, Charleston, for Defendant.

J. David Cecil, Esq., James F. Humphreys & Associates, L.C., Charleston, for Amici Curiae, Plaintiffs in "Asbestos–Unfair Trade Practices Cases".

STARCHER, Justice.

This case is before this Court upon a certified question from the United States District Court for the Northern District of West Virginia at Martinsburg. The plaintiff in the federal court lawsuit, Hubert J. Barefield,

alleges that an insurance company, defendant DPIC Companies, Inc., violated the West Virginia Unfair Trade Practices Act in the litigation and settlement of a legal malpractice action filed by Mr. Barefield. The plaintiff contends that the defendant hired a defense attorney to represent its insured in the underlying legal malpractice action, and permitted or required the attorney to violate the Act.

The question from the district court concerns whether an insurance company may be held liable under the Act for the conduct of a defense attorney hired to represent the interests of an insured in a liability action, and whether an insurance company can be held liable for violations of the Act that occur after a lawsuit is filed against an insured. We answer the first portion of the district court's question in the negative, but answer the second portion in the affirmative.

## I.

### *Facts & Background*

In 1992, plaintiff Hubert J. Barefield was injured in Virginia. Mr. Barefield sought medical treatment from a doctor in Virginia, and continued to receive treatment through June 1994.

On October 17, 1994, Mr. Barefield met with a West Virginia attorney, "Attorney A," to investigate the possibility of filing a medical malpractice action in Virginia against the Virginia doctor. Mr. Barefield signed a contract with Attorney A on February 21, 1995, and Attorney A later videotaped a sworn statement with Mr. Barefield, in which she questioned him at length and established the factual predicates for filing a medical malpractice lawsuit.

Attorney A never filed a medical malpractice lawsuit on Mr. Barefield's behalf, thereby missing the Virginia statute of limitation. Mr. Barefield then retained another law firm to represent him in a legal malpractice claim against Attorney A, and in April 1999 Mr. Barefield's new attorneys informed Attorney A's malpractice insurer, defendant DPIC Companies, Inc. ("DPIC"), of the legal malpractice claim. DPIC then retained a defense attorney, "Attorney S," to represent Attorney A. All subsequent discussions and negotiations with the plaintiff on behalf of DPIC were apparently conducted solely by Attorney S.

Mr. Barefield filed his legal malpractice claim against Attorney A in October 1999, and trial was scheduled for February 12, 2001. Before and after filing the legal malpractice lawsuit, Mr. Barefield's attorneys submitted various settlement demands to Attorney S—demands starting as high as $2,000,000.00—and included reports indicating that actionable medical malpractice had been committed under Virginia law against Mr. Barefield by his Virginia doctor, and that Attorney A had committed legal malpractice by failing to timely file the medical malpractice lawsuit. At the same time, Attorney S was repeatedly told that Mr. Barefield was in financial straits and in poor physical health.[1] Attorney S, on behalf of DPIC, rejected the plaintiff's settlement demands.[2]

---

1. For instance, on June 25, 1999—nearly four months before the legal malpractice action was filed—one of Mr. Barefield's attorneys stated in a letter to Attorney S:

   As you know, I have been working to assemble a complete Demand Package and List of Damages on behalf of Mr. Barefield. As you have probably anticipated, his clear totals are rapidly approaching a multi-million dollar level. I would request that you notify me of Ms.[A.]'s policy limits as expediently as possible as we will likely be making a policy limits demand.

   I remind you that Mr. Barefield ... [has] been living at the poverty line for a number of years now. Accordingly, an immense amount of appreciation would be felt if we both could

assign this case a priority status and avoid long delays between communications and exchanges of information.

2. DPIC asserts that Attorney S initially rejected the settlement demands, and made no counter-offers, on the belief that the two-year Virginia medical malpractice statute of limitation had already expired when Mr. Barefield first spoke with Attorney A in October 1994. Mr. Barefield's attorneys subsequently gave Attorney S a report showing that under Virginia law, medical malpractice is a "continuing tort" that occurs so long as the plaintiff/patient is being treated by the allegedly-negligent doctor. Mr. Barefield was last treated by his Virginia doctor in June 1994, five months before he visited Attorney A.

In February 2000, DPIC authorized Attorney S to make its first offer to settle the case in a "high-low" arrangement, such that DPIC would make an interim payment to the plaintiff of $25,000.00 in exchange for a cap on DPIC's liability at $250,000.00. The plaintiff rejected the offer,[3] but DPIC eventually made an interim payment to Mr. Barefield of $5,000.00 in April 2000 (and the parties agreed this amount would be credited against any final settlement).

On November 29, 2000, after further settlement negotiations that included discussions about Mr. Barefield's financial and medical situation, Mr. Barefield agreed to settle his claim for $250,000.00, the highest amount Attorney S had proposed in February 2000. Mr. Barefield now contends he believed his case was worth more, but that he accepted this settlement primarily because of his poor financial and medical condition at the time.

One year later, on November 29, 2001, Mr. Barefield filed the instant action in the Circuit Court of Berkeley County against DPIC alleging that DPIC violated the West Virginia Unfair Trade Practices Act ("UTPA"), *W.Va.Code*, 33–11–1 to –10, in its defense and settlement of the legal malpractice action. Mr. Barefield alleged that DPIC, through the actions of its defense attorney, Attorney S, delayed acting on Mr. Barefield's claim even though Attorney A's liability was reasonably clear, and thereby took advantage of Mr. Barefield's physical and financial difficulties to negotiate a settlement far lower than what his claim was worth, in violation of the Act. Mr. Barefield took the position that on behalf of DPIC, Attorney S had breached several duties owed to him under the Act, including a duty to promptly conduct a reasonable investigation of his claim, and a duty to in good faith attempt to effect a prompt, fair and equitable settlement of his claim once Attor-

ney A's liability became reasonably clear. *See W.Va.Code*, 33–11–4(9) [2002]. The plaintiff alleged that DPIC's acts, or its failures to act, were not isolated but resulted from DPIC's general business practices in violation of the Act.

DPIC removed the action from state court to the United States District Court for the Northern District of West Virginia. DPIC subsequently moved for summary judgment to dismiss Mr. Barefield's action, contending that an insurance company cannot be held liable under the UTPA for the actions of a defense attorney hired to represent an insured in a liability insurance matter. Furthermore, DPIC contended that the UTPA does not apply to claims that are in litigation, and therefore did not apply to the protracted settlement negotiations that occurred after Mr. Barefield filed his legal malpractice suit.

## II.

### *Certified Question*

The district court did not rule upon DPIC's motion for summary judgment to dismiss the plaintiff's action. Instead, the district court certified the following question to this Court:

> Under the West Virginia Unfair Trade Practices Act, specifically W.Va.Code § 33–11–4(9), is an insurer liable to a third party for the conduct of an attorney hired by the insurer, when that attorney is hired by the insurer to represent the insurer's insured, and when the attorney's conduct took place during and after the initiation of a civil action against the insurer's insured for legal malpractice?

The district court did not directly answer that part of the question relating to whether an insurance company could be held liable for the actions of an attorney hired to defend an

---

**3.** In a February 28, 2000 letter to Attorney S, counsel for Mr. Barefield rejected the settlement offer as "a woefully inadequate offer under the circumstances."

> As we all know, liability is reasonably clear. It appears that we are only arguing as to the amount of damages.... Please help us and Mr. Barefield understand that this is not just an effort by DPIC to get out of the case for less money than the case deserves, knowing Mr.

Barefield's desperate financial situation.... I would be interested to learn why DPIC feels the damages should be capped at $250,000.00 when past medical bills alone total at least $196,848.59. Mr. Barefield will continue to require medication throughout his life which will total at least $12,000.00 per year. If you or DPIC have anything to indicate that our damages are not what we say they are, please advise us immediately.

insured in a liability matter. However, the district court did conclude that "because the attorney's actions in this case took place *after* litigation was initiated, the West Virginia Unfair Trade Practices Act does not apply."

## III.

### *Discussion*

■ Before answering the questions certified by the district court, it is important to point out that we are not sitting as an appellate court; rather, pursuant to the Uniform Certification of Questions of Law Act, *W.Va. Code*, 51–1A–1 to –13 [1996], we are simply asked to answer questions of law. Accordingly, the factual record regarding the legal issue in dispute must be sufficiently precise and undisputed, and this Court will assume that the findings of fact by the certifying court are correct. Further, the legal issue must substantially control the case. *See* Syllabus Point 5, *Bass v. Coltelli*, 192 W.Va. 516 453 S.E.2d 350 (1994); *Mutafis v. Erie Ins. Exchange*, 174 W.Va. 660, 663, 328 S.E.2d 675, 678 (1985).

■ This Court employs a plenary standard of review when we answer certified questions from a federal district court. In Syllabus Point 1 of *Light v. Allstate Ins. Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998), we held that "[a] de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court." *Accord*, Syllabus Point 1, *Bower v. Westinghouse Elec. Corp.*, 206 W.Va. 133, 522 S.E.2d 424 (1999) ("This Court undertakes plenary review of legal issues presented by certified question from a federal district or appellate court."). However, when a certified question is framed so that this Court is not able to fully address the law which is involved in the question, then this Court retains the power to reformulate the questions certified to it. Syllabus Point 3, *Kincaid v. Mangum*, 189 W.Va. 404, 432 S.E.2d 74 (1993).

We discern that there are two separate issues under the Unfair Trade Practices Act contained within the district court's certified question, namely:

(1) Can an insurance company be liable under the Act for the conduct of a defense attorney hired by the insurance company to represent the insurance company's insured in a liability matter; and

(2) Can an insurance company under any circumstances be held liable for its violations of the Act that occur after the filing of a civil action against an insured?

We reformulate the district court's question to consider these two issues separately. As we discuss in detail below, we answer the first question "no," [4] and the second question "yes."

### A.

### *Liability of an insurance company under the UTPA for the actions of a defense attorney*

The plaintiff in the instant action, Mr. Barefield, contends that an insurance company has a duty under the UTPA to avoid, among other things, engaging in unfair or abusive settlement practices. The plaintiff further contends that this duty cannot be delegated to any other person, including a defense attorney hired by the insurance company to defend the interests of an insured in a liability matter. In other words, the plaintiff argues that because the insurance company could not, under the UTPA, legally refuse to settle the plaintiff's claim once liability became reasonably clear, the insurance company could not then legally instruct Attorney S, as an agent of the insurance company, to refuse to settle the plaintiff's claim as a way of avoiding responsibility under the UTPA.

The defendant insurance company, DPIC, argues that an attorney retained by an insurance company to defend an insured must, under the *Rules of Professional Conduct*, defend the case in the best interests of the

---

**4.** However, as we discuss in more detail in both Sections III.A. and III.B., *infra*, an insurance company can be held liable for its own actions that violate the UTPA, when the insurance company knowingly encourages, directs, participates in, relies upon, or ratifies wrongful conduct by a defense attorney hired by the insurance company to represent an insured in a liability matter. *See* Syllabus Point 6, *Rose v. St. Paul Fire & Marine Ins. Co.*, 215 W.Va. 250, 599 S.E.2d 673 (2004).

insured—not the insurance company—and the insurance company cannot infringe on the attorney's duties to the insured.[5] The defendant therefore contends that the defense attorney is not an agent of the insurance company, and that any allegations of unfair conduct against the attorney for aggressive or wrongful litigation actions cannot constitute a violation of the UTPA.

■ We recently addressed this precise issue in *Rose v. St. Paul Fire & Marine Ins. Co.*, 215 W.Va. 250, 599 S.E.2d 673 (2004). As we noted in *Rose*, the purpose of the UTPA "is to regulate trade practices *in the business of insurance* [.]" 215 W.Va. at 255, 599 S.E.2d at 678, *quoting W.Va.Code*, 33–11–1 [1974] (emphasis added). This is because "[t]he Unfair Trade Practices Act, W.Va.Code §§ 33–11–1 to –10, and the tort of bad faith apply only to those persons or entities and their agents who are engaged in the business of insurance." Syllabus Point 2, *Hawkins v. Ford Motor Co.*, 211 W.Va. 487, 566 S.E.2d 624 (2002).

Examining the phrase "business of insurance" as used in the UTPA, we stated in *Rose* that:

... we do not perceive a defense attorney, employed by an insurance company to represent an insured in a liability matter, to be a person who is "in the business of insurance." There is nothing to suggest that the defense attorneys in this case had any contractual obligations to pay the appellee's claim ... nor anything to suggest the defense attorneys made, solicited, negotiated, or otherwise directly acted in any manner pursuant to the terms of an insurance contract. The defense attorneys were employed by the insurance company to defend the interests of the insured; the insurance contract at issue bound only the

insurance company and the insured.... [T]he defense attorneys' ethical attorney-client obligations were to the insured.... Any obligations imposed by an insurance contract were between [the insured] and [the insurance company], and the defense attorneys were neither parties to nor bound by that contract.

215 W.Va. at 257, 599 S.E.2d at 680.

■ We concluded in Syllabus Point 5 of *Rose* that:

A defense attorney who is employed by an insurance company to represent an insured in a liability matter is not engaged in the business of insurance. The defense attorney is therefore not directly subject to the provisions of the West Virginia Unfair Trade Practices Act, *W.Va.Code*, 33–11–1 to –10.

■ We see no difference between the facts of the instant case and those in *Rose*.[6] The defense attorney, Attorney S, was employed by the insurance company, DPIC, to represent the interests of an insured, Attorney A, against a lawsuit seeking to impose civil liability for legal malpractice. We see nothing in the record presented to suggest that Attorney S was in any way engaged in the business of insurance. Accordingly, the defense attorney was not subject to the provisions of the UTPA, and his actions, standing alone, cannot form the basis of an action against the insurance company.

■ This does not mean, however, that the defendant is fully absolved from any potential responsibility by our holding. We made clear in *Rose* that an insurance company in the business of insurance must continue to comply with the UTPA, and can be held liable for its *own* actions that violate the UTPA—regardless of the actions of a de-

5. We address this argument in Section III.B., *infra*.

6. We made clear that our holding in *Rose* was limited solely to "an independent attorney, hired by an insurance company to defend the interests of a defendant-insured under a liability insurance policy against a claim made by a plaintiff[.]" 215 W.Va. at 257 n. 7, 599 S.E.2d at 680 n. 7.

We did not consider "the case of an attorney who is hired by an insurance company in other circumstances—such as to investigate or give advice upon the validity of a claim in the same fashion as a company claims representative; to defend the interests of the insurance company; or an attorney who works 'in house' for the company or in a 'captive' law firm that is employed exclusively by the insurance company to represent only the company's insureds." *Id.*

fense attorney it might employ to defend an insured. As we said in Syllabus Point 6 of *Rose:*

> A claimant can establish a violation of the West Virginia Unfair Trade Practices Act, *W.Va.Code,* 33–11–1 to –10, by showing that an insurance company, through its own actions, breached its duties under the Act by knowingly encouraging, directing, participating in, relying upon, or ratifying wrongful litigation conduct of a defense attorney hired by the insurance company to represent an insured.

It is well established, of course, that if a plaintiff is alleging that an insurance company violated the UTPA by committing an unfair claim settlement practice, as set forth in *W.Va.Code,* 33–11–4(9) [2002], the plaintiff must establish that the insurance company had a "general business practice" of committing unfair claim settlement practices and that the breach of the law was not an isolated event. *See* Syllabus Point 3, *Jenkins v. J.C. Penney Cas. Ins. Co.,* 167 W.Va. 597, 280 S.E.2d 252 (1981), *overruled on other grounds by State ex rel. State Farm Fire & Cas. Co. v. Madden,* 192 W.Va. 155, 451 S.E.2d 721 (1994). "It is possible that multiple violations of W.Va.Code, 33–11–4(9), occurring in the same claim would be sufficient [to establish a 'general business practice.']" *Jenkins,* 167 W.Va. at 610, 280 S.E.2d at 259–60. As we stated, in Syllabus Point 4 of *Dodrill v. Nationwide Mut. Ins. Co.,* 201 W.Va. 1, 491 S.E.2d 1 (1996):

> To maintain a private action based upon alleged violations of W.Va.Code § 33–11–4(9) in the settlement of a single insurance claim, the evidence should establish that the conduct in question constitutes more than a single violation of W.Va.Code § 33–11–4(9), that the violations arise from separate, discrete acts or omissions in the claim settlement, and that they arise from a habit, custom, usage, or business policy of the insurer, so that, viewing the conduct as a whole, the finder of fact is able to conclude that the practice or practices are sufficiently pervasive or sufficiently sanctioned by the insurance company that the conduct can be considered a "general busi-

ness practice" and can be distinguished by fair minds from an isolated event.

The district court's certified question asked, in part, whether under the UTPA "an insurer [is] liable to a third party for the conduct of an attorney hired by the insurer, when that attorney is hired by the insurer to represent the insurer's insured[.]" We answer this portion of the district court's question "no," because defense attorneys are not engaged in the business of insurance, and the insurance company cannot be held liable for merely hiring the attorney to represent an insured. The insurance company may, however, be liable for its *own* conduct if it is shown that the company breached the Act by knowingly encouraging, directing, participating in, relying upon or ratifying the wrongful conduct of an attorney hired by the insurance company.

## B.

### *Duties under the UTPA after the initiation of a civil action*

The district court concluded in its answer to the certified question—as it had concluded in an earlier opinion, *McDaniel v. Travelers Property Cas. Ins. Co.,* 121 F.Supp.2d 508 (N.D.W.Va.2000)—that all conduct by an insurance company which takes place after the filing of a civil action against the insurance company's insured, regardless of the nature of that conduct, cannot under any circumstances support a cause of action against the insurance company under the UTPA. As the district court stated in its certification order, quoting its earlier opinion in *McDaniel,* "an insurance company's actions after litigation is instituted cannot be properly introduced as bad faith." *See McDaniel,* 121 F.Supp.2d at 512. In other words, the district court ruled that an insurance company has absolutely no duty whatsoever to comply with the requirements of the UTPA once a claimant files a lawsuit against an insurance company's insured.

The defendant insurance company argues that the district court's interpretation of the UTPA is correct, and argues that the UTPA is designed to regulate conduct relating to "claims," not conduct relating to "litigation."

The plaintiff counters that the UTPA does not distinguish between unfair trade practices committed before or after litigation has commenced, and argues that the UTPA does not state that the provisions of the law become inoperative when a civil action is filed. As the plaintiff's attorney summarized at oral argument, "if it's an unfair trade practice the day before suit is filed, it's an unfair trade practice the day after suit is filed."

The arguments of the parties illustrate differing views of public policy, views that we believe can be reconciled. On the one hand, the plaintiff argues that the defendant insurance company is claiming complete immunity for its post-litigation conduct that violates the UTPA. The plaintiff suggests that adopting the defendant's arguments would permit an insurance company to abuse the legal system and delay the resolution of valid claims. The public policy encompassed by the plaintiff's arguments is that the UTPA was enacted so that insurance companies would be required to act fairly, promptly resolve valid claims where the issues are not legitimately in dispute, and not use protracted, expensive legal proceedings to exhaust an injured party into accepting a low settlement.

On the other hand, the defendant insurance company argues that both defendants *and* insurance companies are entitled to a zealous defense by an attorney once a lawsuit is filed against an insured, and that it should be permitted to employ defense attorneys to (indirectly) defend their assets by any means once a lawsuit has been filed, regardless of the merits of the defense that is interposed, and to delay the resolution of a case until a settlement favorable to the insurance company can be reached.

We believe that the language of the UTPA somewhat reconciles the positions of both the plaintiff and defendant. The UTPA is intended to require insurance companies to deal fairly with individuals seeking to recover under an insurance policy, and to promptly resolve valid claims that are not reasonably in dispute—regardless of whether or not a lawsuit has been filed.

However, as we discuss in more detail below, the UTPA is decidedly not intended to interfere with the exercise of an attorney's zealous, independent, professional judgment in the defense of a client, and should never be read as doing so. We believe that an attorney retained by an insurance company to defend an insured is ethically required to independently and vigorously defend the interests of the insured.

■ We begin our analysis by looking to the language of the UTPA. "Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syllabus Point 2, *State v. Elder*, 152 W.Va. 571, 165 S.E.2d 108 (1968). *In accord*, Syllabus Point 2, *State v. Epperly*, 135 W.Va. 877, 65 S.E.2d 488 (1951) ("A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.").

The UTPA prohibits individuals in the business of insurance from engaging in certain unfair acts and practices, including a host of unfair claim settlement practices that are set forth in *W.Va.Code*, 33–11–4(9) [2002]. That section states, in part:

No person shall commit or perform with such frequency as to indicate a general business practice any of the following: . . .

(d) Refusing to pay claims without conducting a reasonable investigation based upon all available information; . . .

(f) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; . . .

(n) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement[.]

The defendant asserts that the Legislature's choice of the word "claim" in the UTPA indicates an intent to exclude from regulation by the UTPA insurance company conduct relating to "litigation." However, the definition of the word "claim" includes meanings such as "a demand for something as due; an assertion of a right to some-

thing;"[7] "a demand for something due or believed to be due;"[8] and "a demand for compensation, benefits, or payment (as ... one made under an insurance policy upon the happening of the contingency against which it is issued)."[9] In other words, the Legislature's repeated use of the word "claim" in the UTPA indicates an intent to impose duties upon those in the business of insurance to fairly deal with persons asserting a right or demanding something that is believed to be rightfully due under an insurance policy. A lawsuit or litigation is simply a means of asserting a right or demanding something by using the judicial process.[10]

■ Furthermore, the purpose of the UTPA, which is plainly stated in *W.Va.Code*, 33–11–1 [1974], is to:

> ... regulate trade practices in the business of insurance ... by defining, or providing for the determination of, all such practices in this State which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.

At its heart, the UTPA establishes a "legislative policy encouraging prompt settlement of meritorious claims [that] parallels our long-standing judicial policy that encourages compromise and settlement of disputed claims[.]" *Jenkins*, 167 W.Va. at 607, 280 S.E.2d at 258.

■ We find no caveat in the UTPA, and the defendant directs us to no such language, which states that an insurance company or other person in the business of insurance only has a duty to refrain from "unfair methods of competition or unfair or deceptive acts or practices" prior to the filing of a lawsuit by a party, but has no such duty thereafter. We find nothing to show that the public policy established in *W.Va.Code*, 33–11–1 is obviated once litigation ensues. We therefore must conclude that the language of the UTPA does not restrict the scope of the

conduct that is proscribed by the Act to that which occurred prior to the filing of a lawsuit. *In accord, O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901 (Pa.Super.1999) (bad faith suits may extend to the misconduct of an insurer during the pendency of litigation); *Federated Mut. Ins. Co. v. Anderson*, 297 Mont. 33, 991 P.2d 915 (1999) (insurance company's prosecution of a "meritless appeal" could be used to support a claim for unfair trade practices); *Gooch v. State Farm Mut. Automobile Ins. Co.*, 712 N.E.2d 38 (Ind.App.1999) (insurance company's litigation conduct admissible in determining whether company made a bad-faith attempt to force insured to settle uninsured motorist claim); *Tucson Airport Authority v. Certain Underwriters at Lloyd's, London*, 186 Ariz. 45, 918 P.2d 1063 (Ariz.App.1996) (wrongful litigation conduct of insurance company toward insured during coverage lawsuit was not rendered inadmissible due to "litigation privilege"); *Palmer by Diacon v. Farmers Ins. Exchange*, 261 Mont. 91, 121, 861 P.2d 895, 913 (1993) ("[A]n insurer's duty to deal fairly and not to withhold payment of valid claims does not end when an insured files a complaint against the insurer.").

[14] Our conclusion that the Legislature intended to regulate the actions of companies and individuals in the business of insurance, before and after the initiation of a lawsuit, is also compelled by the manner in which the Legislature regulates the premiums insurance companies may charge, and the profits companies may earn. "The insurance business is quasi-public in its character, and the state may, under its police power, ... prescribe the terms and conditions on which it may be conducted and generally to regulate it and all persons engaged in it." *Swearingen v. Bond*, 96 W.Va. 193, 197, 122 S.E. 539, 540 (1924). The Legislature regulates the premiums insurance companies may charge so as "to promote the public welfare by regulating insurance rates to the end that they

---

7. II *Oxford English Dictionary* 451 (1970).

8. *Merriam–Webster's Collegiate Dictionary* 210 (10th Ed., 2001).

9. *Webster's Third New International Dictionary* 414 (1970).

10. *Blacks's Law Dictionary* 841 (5th Ed.1979) defines "litigation" as a "[c]ontest in a court of law for the purpose of enforcing a right[.]" A "lawsuit" is "a process in law instituted by one party to compel another to do him justice." *Id.* at 799.

shall not be excessive, inadequate or unfairly discriminatory[.]" *W.Va.Code,* 33–20–1 [1957]. To achieve this goal, *W.Va.Code,* 33–20–3(a) [1976] states that when an insurance company sets the premium rates that it will charge customers, the company must give due consideration "to past and prospective loss experience" and "to a reasonable margin for underwriting profit."[11] The insurance company's proposed premium rates are reviewed and approved by the insurance commissioner.

So, while there might be some theoretical appeal in the notion that a liability insurer has a right to maximize its financial well-being by aggressively litigating and refusing to pay valid claims, such a notion ignores the fact that, under the law, the premiums the liability insurer charges *already account for the financial well-being of the insurance company.* An insurance company is not like the average citizen or business defending their assets against a lawsuit; an insurance company exists to pay valid claims, and charges premiums that provide sufficient resources to pay those claims. The regulated premiums charged by an insurance company and paid by the insurance consumer have been approved by the State at a level that ensures a fair profit after the insurance company has paid all past and prospective valid claims. To then allow an insurance company to increase its underwriting profit by unreasonably defending claims, while still charging the same premiums, violates the public policy underlying the premium-rate statutes. Allowing an insurance company to employ unfair practices "create[s] market disadvantages for other honest insurance companies" because these illicit practices unfairly increase its profits, thereby placing pressure on other insurance companies to also adopt equally reprehensible tactics. *Campbell v. State Farm Mut. Auto. Ins. Co.,* 65 P.3d 1134, 1150 (Utah 2001) (*reversed on other grounds by State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)).

Our conclusion is also compelled by the disparity in economic bargaining power between insurance companies and the average litigant. As we discussed in *Poling v. Motorists Mutual Ins. Co.,* 192 W.Va. 46, 48, 450 S.E.2d 635, 637 (1994):

> Often in lawsuits, there is a disparity of bargaining power between the plaintiff and defendant. In most cases, the defendant has a resource advantage over the plaintiff and is able to draw out a trial into a prolonged blizzard of mindless motions, countless continuances, and dreadful delay.
>
> The mere fact that after months of delay and hassle the insurance company deigns to speak to the injured party and settles the case for the policy limits after realizing that the plaintiff is not going to accept some outlandish low-ball offer, does not automatically preclude the plaintiff from later bringing a bad faith action....

Put simply, the goal of the UTPA is to make bad-faith behavior by those in the business of insurance—whether or not a lawsuit has been filed by the claimant—economically unattractive.

Were we to adopt the defendant's argument, and hold that the UTPA did not apply to insurance company conduct occurring after litigation ensues, would be to suggest that the Legislature intended to reward obstinacy by insurance companies in the compromise and settlement of claims. Such an interpretation of the UTPA would provide a disturbing incentive for insurance companies to push meritorious claims into litigation, thereby consuming limited judicial resources, further crowding congested dockets, and burying claimants in a "prolonged blizzard of mindless motions, countless continuances, and dreadful delay." *Poling,* 192 W.Va. at 48, 450 S.E.2d at 637. The prompt resolution of meritorious claims would be delayed by insurance companies, even where liability was reasonably clear, simply to "starve out" claimants to obtain a settlement more favorable to the owners or shareholders of the

---

**11.** *W.Va.Code,* 33–20B–2(a) and (b) [2003] similarly requires companies providing medical malpractice insurance to give "[d]ue consideration" to "past and prospective loss experience within and outside this state" and "to a reasonable margin for underwriting profit" when determining premium rates.

**556**

insurance company. We reject such an interpretation of the UTPA.

■ The UTPA, however, was not intended to restrict a defense attorney's representation of a client or deter the attorney's vigorous protection of the client's interests. The fact that the defense attorney is being paid by an insurance company should not alter the attorney's actions, and the UTPA should never be read to infringe upon an attorney's legitimate actions taken in the course of a lawsuit.

Attorneys have long struggled with the contractual and ethical quandaries presented by the "tripartite" relationship between defense attorney, insurance company, and insured. The Supreme Court of Mississippi once observed that the "ethical dilemma thus imposed upon the carrier-employed defense attorney" by the relationship between insurer, client-insured, and insurance-company-paid defense attorney is one that "would tax Socrates." *Hartford Accident & Indemnity Co. v. Foster,* 528 So.2d 255, 273 (Miss.1988).

■ However, as our holding in *Rose v. St. Paul Fire & Marine Ins. Co.,* 215 W.Va. 250, 599 S.E.2d 673 (2004) supports, the Legislature did not intend to impose an additional ethical dilemma upon insurance-company-paid defense attorneys by requiring them to measure their actions in defense of a client under the UTPA, because attorneys are not in the business of insurance. We therefore

agree with the defendant's argument in the instant case that a defense attorney, employed to represent an insured in a liability matter, is not bound by the UTPA and is not an agent of the insurance company, because the attorney is professionally obligated to represent only the interests of the client/insured, not the interests of the insurance company.

In *State ex rel. Allstate Ins. Co. v. Gaughan,* 203 W.Va. 358, 508 S.E.2d 75 (1998), we concluded that a defense attorney represents only the insured, and not the insurer that is paying the defense attorney's fee. While it has been argued that the attorney represents both the insurer and insured, we acknowledged that "[i]n reality, the insurer actually hires the attorney to represent the insured." 203 W.Va. at 372, 508 S.E.2d at 89.

Our examination of the *Rules of Professional Conduct* supports our statement in *Gaughan.* We find that there are at least three applicable provisions in the *Rules* which preclude an attorney paid by an insurance company from jointly representing both the insurance company and the insured in a liability matter: Rules 1.7, 1.8(f), and 5.4(c).[12]

Rule 1.7[13] is the first rule that weighs against an attorney's joint representation of both the insurance company and the insured. Rule 1.7 was adopted to ensure an attorney's loyalty to a client and preclude the attorney

---

**12.** The requirement that a lawyer maintain the confidentiality of client information, as specified in Rule 1.6 [1989] of the *Rules of Professional Conduct,* can also be implicated when an insurance company retains a lawyer to represent an insured. The confidentiality requirement is most likely to be infringed by "insurers' requests to defense counsel to submit bills directly to outside auditors." Amy S. Moats, Student Work, "A Bermuda Triangle in the Tripartite Relationship: Ethical Dilemmas Raised by Insurers' Billing and Litigation Management Guidelines," 105 W.Va. L.Rev. 525, 529–530 (2003). The West Virginia Lawyer Disciplinary Board, in response to a legal ethics inquiry, is of the opinion that "pursuant to Rule 1.6 a lawyer may only submit legal bills to outside auditors, reviewers, or similar entities if the insured consents to this release." *See* LEI 99–02, "Submitting Insurance Defense Legal Bills to Outside Auditors or Reviewers."

**13.** Rule 1.7 of the *Rules of Professional Conduct* states:
    (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
    (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
    (2) each client consents after consultation.
    (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
    (1) the lawyer reasonably believes the representation will not be adversely affected; and
    (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

from undertaking the simultaneous representation of another client with interests that are actually or potentially adverse to the existing client without both clients' knowledgeable consent. The rule does not require a current conflict of interest or current material limitation on the attorney's behavior before the attorney may be precluded from jointly representing two clients. Rather, all that is required by Rule 1.7 is that there "may be" such a conflict or limitation in the future.

■ A conflict of interest between an insurance company and an insured "occurs whenever their common lawyer's representation of the one is rendered less effective by reason of [the lawyer's] representation of the other." *Spindle v. Chubb/Pacific Indemnity Group,* 89 Cal.App.3d 706, 713, 152 Cal.Rptr. 776, 780–81 (1979). "Even the most optimistic view of human nature requires us to realize that an attorney employed by an insurance company will slant his efforts, perhaps unconsciously, in the interests of his real client—the one who is paying his fee and from whom he hopes to receive future business—the insurance company." *U.S. Fidelity and Guaranty Co. v. Louis A. Roser Co.,* 585 F.2d 932, 938 n. 5 (8th Cir.1978). An attorney should "not be permitted to put himself in a position where, even unconsciously, he will be tempted to 'soft pedal' his zeal in furthering the interests of one client in order to avoid an obvious clash with those

of another." *Committee on Legal Ethics v. Frame,* 189 W.Va. 641, 645, 433 S.E.2d 579, 583 (1993) (citation omitted).

In insurance defense, if an attorney simultaneously represents the interests of both the insured and the insurance company, there is a substantial likelihood that the attorney's representation of either party may in the future be materially limited. *See* Robert E. Keeton and Alan I. Widiss, *Insurance Law* 809 [1988] ("There is a very substantial prospect that actual or potentially conflicting interests between an insurer and an insured will exist in regard to almost any tort claim that may be covered by liability insurance.").[14] Accordingly, because of that likelihood, Rule 1.7 generally precludes a defense attorney from jointly representing both the insurance company and the insured in a liability matter.

Rules 1.8(f)[15] and 5.4(c)[16] of the *Rules of Professional Conduct* also weigh against an attorney's joint representation of both an insurance company and the client/insured in the liability insurance context. These two *Rules of Professional Conduct* discuss the limitations upon an attorney when the attorney is hired and paid by a third party to represent a client. These two rules do not prohibit an attorney from being paid by an individual other than the client, such as an insurance company. Rather, the *Rules* impose a duty upon the attorney to represent

---

14. For example,
   [t]he client may at a later date reveal to the lawyer that someone else—not the insured— was actually driving the car; or that the insured's conduct was intentional rather than negligent.... An offer of settlement may come which the insurer believes is too high, but the insured may have a strong preference for avoiding the time, irritations, and anxieties of trial preparation. Or, as the case proceeds it may become apparent that there is exposure for punitive damages, or damages beyond the limits of the liability [insurance], thus creating a conflict situation if an offer to settle within the policy limits is made. Or the insured may have a simple and understandably humane preference that the plaintiff he has injured be paid compensation by the insurer, whether or not plaintiff and insured are related family members, friends, or strangers.
   Stephen L. Pepper, "Applying the Fundamentals of Lawyers" Ethics to Insurance Defense Practice, 4 Conn.Ins.L.J. 27, 31 (1997).

15. Rule 1.8(f) of the *Rules of Professional Conduct* states:

   (f) A lawyer shall not accept compensation for representing a client from one other than the client unless:
   (1) The client consents after consultation;
   (2) There is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and
   (3) Information relating to representation of a client is protected as required by Rule 1.6 [relating to confidentiality].

16. Rule 5.4(c) of the *Rules of Professional Conduct* states:

   (c) A lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal service for another to direct or regulate the lawyer's professional judgment in rendering such legal services.

the sole interests of the client and to fully inform the client of the individual's payment arrangement, and prohibits the individual who is paying the attorney from interfering with the attorney's zealous, independent representation of the client.[17]

Arguably, the language of both Rules 1.7 and 1.8(f) might allow an attorney hired and paid by an insurance company to protect the insurance company's interests, and comply with the insurance company's directives and restrictions, in the representation of an insured if the insured "consents after consultation." However, the *Rules* also require that there must also be "no interference with the lawyer's independence of professional judgment," Rule 1.8(f)(2), and the attorney must reasonably believe that "the representation will not be adversely affected" by the joint representation. Rule 1.7(b)(1). More specifically, Rule 5.4(c) prohibits a third-party who pays for an attorney's services from "direct[ing] or regulat[ing] the lawyer's professional judgment in rendering such legal services."

■ In sum, our *Rules of Professional Conduct* compel us to the conclusion that when an insurance company hires a defense attorney to represent an insured in a liability matter, the attorney's ethical obligations are owed to the insured and not to the insurance company that pays for the attorney's services. *In accord, In re Rules of Professional Conduct and Insurer Imposed Billing Rules and Procedures,* 299 Mont. 321, 333, 2 P.3d 806, 814 (2000); *Higgins v. Karp,* 239 Conn. 802, 810, 687 A.2d 539, 543 (1997); *Petition of Youngblood,* 895 S.W.2d 322, 328 (Tenn. 1995); *Atlanta Intern. Ins. Co. v. Bell,* 438 Mich. 512, 520, 475 N.W.2d 294, 297 (1991); *First American Carriers, Inc. v. Kroger Co.,* 302 Ark. 86, 89–91, 787 S.W.2d 669, 671 (1990).

■ Because a defense attorney is ethically obligated to maintain an independence of professional judgment in the defense of a client/insured, an insurance company possesses no right to control the methods or means chosen by the attorney to defend the insured. As one court stated, an insurance company "cannot control the details of the attorney's performance, dictate the strategy or tactics employed, or limit the attorney's professional discretion with regard to the representation [of the insured]." *Petition of Youngblood,* 895 S.W.2d at 328. Accordingly, "an attorney hired by an insurer to defend an insured must be considered, at least initially, to enjoy the status of an independent contractor." *Givens v. Mullikin ex rel. Estate of McElwaney,* 75 S.W.3d 383, 394 (Tenn.2002).[18]

---

17. The Comment to Rule 5.4 supports this conclusion:

> When someone other than a client pays the lawyer's fee or salary, ... that arrangement does not modify the lawyer's obligation to the client. As stated in paragraph (c), such arrangement should not interfere with the lawyer's professional judgment.

The Comment to Rule 1.5, which relates to attorneys' fees, states similarly:

> An agreement may not be made whose terms might induce the lawyer improperly to curtail services for the client or perform them in a way contrary to the client's interest.

18. The general rule is that the employer of an independent contractor is not liable for harm caused to another by an act or omission of the independent contractor. *Pasquale v. Ohio Power Co.,* 187 W.Va. 292, 302, 418 S.E.2d 738, 748 (1992), *quoting Peneschi v. National Steel Corp.,* 170 W.Va. 511, 521, 295 S.E.2d 1, 11 (1982) (*quoting Restatement (Second) of Torts* § 409 (1976)). "However, over the years, the defense has proved to be a slender reed and one which the courts have found difficult to apply." *Sanders v. Georgia–Pacific Corp.,* 159 W.Va. 621, 625, 225 S.E.2d 218, 221 (1976). This is because, as "we have [previously] acknowledged[,] ... the independent contractor defense is riddled with numerous exceptions that limit its applicability." *Pasquale,* 187 W.Va. at 303, 418 S.E.2d at 749. *See also West v. National Mines Corp.,* 168 W.Va. 578, 588, 285 S.E.2d 670, 677 (1981) ("The general rule that an employer is not liable for the torts of an independent contractor is subject to numerous exceptions").

One of the many exceptions to the independent contractor defense is contained in *Restatement (Second) of Torts,* § 410, which provides that when an independent contractor acts pursuant to the orders or directions of the employer, then the employer "is subject to the same liability ... as though the act or omission were that of the employer himself." "Consequently, although an insurer clearly lacks the *right* to control an attorney retained to defend an insured, we simply cannot ignore the practical reality that the insurer may seek to exercise *actual* control over its retained attorneys in this context." *Givens,* 75

■ It therefore appears clear that an insurance company cannot be held liable under the UTPA for the actions of an attorney hired to defend the interests of an insured, when the defense attorney's strategy and tactics are a result of the attorney's independent, professional discretion with regard to the representation of the client-insured. *See O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901 (Pa.Super.1999) (insurance company's statutory duty to act in good faith did not end upon initiation of lawsuit; however, "the statute clearly does not contemplate actions for bad faith based upon allegation of discovery violations.").[19]

In summary, we hold that the conduct of an insurance company or other person in the business of insurance during the pendency of a lawsuit may support a cause of action under the West Virginia Unfair Trade Practices Act, *W.Va.Code*, 33–11–1 to –10. In so holding, we reject the district court's conclusion in *McDaniel, supra*, that the word "claim" in the UTPA precludes the application of the UTPA to "litigation" conduct by an insurance company or other person in the business of insurance.

However, we also hold that an insurance company cannot be held liable under the West Virginia Unfair Trade Practices Act, *W.Va.Code*, 33–11–1 to –10, for the actions of a defense attorney retained to defend an insured, when the defense attorney's strategy and tactics are a result of the attorney's independent, professional discretion with regard to the representation of the client-insured, and are not otherwise relied upon or ratified by the insurance company in a manner contrary to the Act.

The district court's certified question asked, in part, whether under the UTPA an insurance company could be liable for "conduct [that] took place during and after the initiation of a civil action against the insurer's insured[.]" We answer this portion of the district court's certified question "yes."

## IV.

### Conclusion

In answer to the question certified by the district court, we conclude that an insurance company cannot be held directly liable under the UTPA for the misconduct of a defense attorney hired by the insurance company to represent the interests of an insured in a liability matter, particularly when the defense attorney's conduct results from the attorney's independent, professional judgment, but may be held liable for its own acts by knowingly encouraging, directing, participating, relying upon or ratifying that behavior. We also conclude that an insurance company has a duty to comply with the UTPA after the filing of a civil action against an insured, and can be held liable for violations of the UTPA that occur after litigation commences.

Having answered the certified question from the district court, this case is dismissed from the docket of this Court.

Certified Question Answered.

S.W.3d at 395. When an insurance company seeks, either directly or indirectly, to affect the defense attorney's independent professional judgment or interfere with the attorney's duty of loyalty to the client/insured, "it would be imprudent for this Court to hold that attorneys are independent contractors vis-á-vis insurers, but then to ignore the practical realities of that relationship when it causes injury." *Id.* Accordingly, "an insurer can be held vicariously liable for the acts or omissions of an attorney hired to represent an insured when those acts or omissions were directed, commanded, or knowingly authorized by the insurer." *Id.*

19. Another question arises, however, when the insurance company seeks to exercise control over the defense attorney's strategy and tactics. *See, e.g., Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383 (Tenn.2002) (plain-tiff, alleging tort of abuse of process, stated claim upon which relief could be granted in alleging insurance company directed defense attorneys to engage in excessive discovery for purpose of inducing plaintiff to dismiss tort claim against insured); *Campbell v. State Farm Mut. Auto. Ins. Co.*, 65 P.3d at 1148 (punitive damages award against insurance company supported by evidence company published instruction manual for defense attorneys mandating that they harass and intimidate claimants and witnesses to deter litigation, and that they "employ 'mad dog defense tactics'—using the company's large resources to 'wear out' opposing attorneys by prolonging litigation, making meritless objections, claiming false privileges, destroying documents, and abusing the law and motion process."). It is not clear whether the record in the instant case involves such a situation.

Justice DAVIS concurs and reserves the right to file a concurring opinion.

Justice ALBRIGHT concurs and reserves the right to file a concurring opinion.

Justice MAYNARD concurs in part and dissents in part, and reserves the right to file a separate opinion.

DAVIS, J., concurring.

In this certified question proceeding the majority opinion has made two holdings. First, the majority opinion has concluded that a bad faith action under the unfair trade practices statute may be instituted against an insurer for misconduct occurring after litigation began in the underlying action. Second, consistent with the decision in *Rose v. St. Paul Fire & Marine Insurance Co.*, 215 W. Va. 250, 599 S.E.2d 673 (2004), the majority opinion has concluded that an insurer may be held liable for litigation misconduct of defense counsel when the insurer knowingly encourages, directs, participates in, relies upon, or ratifies such wrongful conduct. I concur in both holdings by the majority opinion. I have chosen to write separately to underscore several points.[1]

## A. Bad Faith Action Premised on Post-litigation Conduct is an Exception to the Litigation Privilege

The parties did not brief the issue of "litigation privilege" as a defense to post-litigation misconduct that is attributed to an insurer. However, I believe this is an issue that was implicitly decided by the majority opinion.

Under the litigation privilege, " '[a]ny communication, oral or written, uttered or published in the due course of a judicial proceeding is ... privileged and cannot constitute the basis of a civil action[.]' " *Jenevein v. Friedman*, 114 S.W.3d 743, 745 (Tex.App. 2003) quoting *Reagan v. Guardian Life Ins.*

*Co.*, 140 Tex. 105, 166 S.W.2d 909, 912 (1942). *See also Collins v. Red Roof Inns, Inc.*, 211 W.Va. 458, 461–66, 566 S.E.2d 595, 598–603 (2002) (discussing litigation privilege). "This privilege extends to any statement made by the judge, jurors, counsel, parties or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case." *James v. Brown*, 637 S.W.2d 914, 917–18 (Tex.1982). The public

policies associated with the litigation privilege include: (1) promoting the candid, objective and undistorted disclosure of evidence; (2) placing the burden of testing the evidence upon the litigants during trial; (3) avoiding the chilling effect resulting from the threat of subsequent litigation; (4) reinforcing the finality of judgments; (5) limiting collateral attacks upon judgments; (6) promoting zealous advocacy; (7) discouraging abusive litigation practices; and (8) encouraging settlement."

*Matsuura v. E.I. du Pont de Nemours & Co.*, 102 Hawai'i 149, 73 P.3d 687, 693 (2003). "[T]he litigation privilege extends beyond claims of defamation to claims of abuse of process, intentional infliction of emotional distress, negligent misrepresentation, invasion of privacy, ... and ... interference with contract and prospective economic advantage." *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1132, 270 Cal.Rptr. 1, 791 P.2d 587 (1990) (citation omitted). *But see Baglini v. Lauletta*, 338 N.J.Super. 282, 768 A.2d 825, 833–34 (2001) ("The one tort excepted from the reach of the litigation privilege is malicious prosecution, or malicious use of process.").

The application of the litigation privilege to a bad faith action against an insurer was squarely addressed by the Arizona appellate court in *Tucson Airport Authority v. Certain Underwriters at Lloyd's, London*, 186 Ariz.

---

**1.** I should point out that the majority opinion expressly ruled upon an issue that was implicitly decided in the *Rose* decision. In *Rose*, the Court recognized a bad faith cause of action under the West Virginia Unfair Trade Practices Act, against an insurer for misconduct by defense counsel under certain conditions. Implicit in the resolution of this issue in *Rose*, was a determination that a cause of action existed for misconduct

occurring after litigation was commenced. This implicit holding has now been expressly addressed in the instant opinion. Thus, in West Virginia, an insurer's duty of good faith in resolving a claim extends to "any stage of the matter, before or after litigation is initiated, in or out of trial." *Texoma Ag–Prods., Inc. v. Hartford Accident & Indem. Co.*, 755 F.2d 445, 447 (5th Cir. 1985).

45, 918 P.2d 1063 (1996). In *Tucson Airport,* a class action was filed against the insured for harm caused when it released a toxic chemical into groundwater.[2] The insured subsequently filed a declaratory judgment action against its insurers to determine coverage in the underlying action. During the course of the litigation in the declaratory judgment action, the insured amended its complaint to state a bad faith claim against the insurers for engaging in misconduct during the declaratory judgment action. "The insurers moved to dismiss, arguing that the alleged misconduct did not constitute bad faith and that, if it did, it was absolutely privileged under Arizona law." *Tucson Airport,* 918 P.2d at 1065. The trial court granted the motion and dismissed the bad faith claim. On appeal, the court of appeals found that the litigation privilege did not bar the bad faith claim. The appellate court reasoned as follows:

The insurers ... contend that even if the [insured's] complaint stated a cause of action, the claim is based on privileged statements made during pending coverage actions by the insurers' counsel. Whether the defense of privilege exists is a question of law. Assuming, without deciding, the privilege even applies in bad faith proceedings, we conclude it does not apply in the circumstances of this case. We are persuaded by the reasoning of the California Supreme Court in *White v. Western Title Ins. Co.,* 40 Cal.3d 870, 221 Cal.Rptr. 509, 710 P.2d 309 (1985). There, the court recognized the difference between a bad faith claim "based squarely on a privileged communication, such as an action for defamation, and one based upon an underlying course of conduct evidenced by the communication." *Id.* at 888, 221 Cal.Rptr. at 518, 710 P.2d at 318. Applying that distinction, the litigation privilege would preclude the former action but would not bar evidence of the communications to prove the latter.

The *White* court noted that

it is not unusual for an insurance company to provide policy benefits, such as the

defense of litigation, while itself instituting suit to determine whether and to what extent it must provide those benefits. It could not reasonably be argued under such circumstances either that the insurer no longer owes any contractual duties to the insured, or that it need not perform those duties fairly and in good faith.

*Id.* at 885–86, 221 Cal.Rptr. at 517, 710 P.2d at 317.

The gravamen of [the insured's] bad faith claim is not a communication, but a course of "wrongful and tortious" conduct evidenced by the insurers' actions and communications during the coverage action[ ]. Furthermore, [the insured's] claim does not assail a pleading but instead alleges that its insurers followed a course of conduct in which they failed to perform their duties fairly and in good faith. To be sure, the insurers in this case ... do not contend that the filing of the coverage action[ ] erased their duties of good faith and fair dealing. The duties nonetheless would be rendered meaningless if, as we understand these insurers to argue, the litigation privilege could be employed to excuse a breach of those duties, which occurs as part of the conduct of a coverage action.

We hold, therefore, that in the circumstances presented in this case, [the insured] sufficiently pled a bad faith claim that is based on unprivileged conduct by its insurers. Accordingly, the trial court erred by dismissing [the insured's] bad faith claim in its second amended complaint.

*Tucson Airport,* 918 P.2d at 1066. *See also Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone,* 107 Cal.App.4th 54, 78, 131 Cal.Rptr.2d 777 (2003) ("[T]he litigation privilege does not shield LaBelle from liability for fraud."); *Matsuura,* 73 P.3d at 694 (holding that litigation privilege does not "limit[ ] liability in a subsequent proceeding where there is an allegation of fraud committed in the prior proceeding").

As I have indicated, the majority decision in the instant case implicitly found that, for

---

2. The litigation in this matter was far more complex and involved several actions. However, I will only discuss the relevant aspects of the litigation.

the exclusive purpose of a bad faith action, there is no litigation privilege defense to misconduct occurring in an underlying claim.

## B. Aggressive Defense Tactics do not Equal Bad Faith Misconduct

The decisions in this case and the *Rose* opinion are not to be interpreted as permitting a cause of action based upon mere aggressive tactics by defense counsel. That is, "an aggressive defense of the insurer's interest is not bad faith." *Jung v. Nationwide Mut. Fire Ins. Co.,* 949 F.Supp. 353, 360 (E.D.Pa.1997). When general "improper litigation conduct is at issue, ... the ... Rules of Civil Procedure provide adequate means of redress, such as motions to strike, compel discovery, secure protective orders, or impose sanctions." *Timberlake Const. Co. v. U.S. Fid. & Guar. Co.,* 71 F.3d 335, 341 (10th Cir.1995). *See O'Donnell ex rel. Mitro v. Allstate Ins. Co.,* 734 A.2d 901, 909 (Pa.Super.1999) ("If a party believes it is subject to improper discovery, the ... Rules of Civil Procedure provide an exclusive remedy[.]"). Consequently, "[t]here is no need to penalize insurers when their attorneys represent them zealously within the bounds of litigation conduct. To allow a jury to find that an insurer acted in bad faith by zealously defending itself is to impose such a penalty." *Federated Mut. Ins. Co. v. Anderson,* 297 Mont. 33, 991 P.2d 915, 922 (1999). To sustain a bad faith cause of action premised on post-litigation misconduct, a plaintiff must allege "conduct sufficiently egregious to be considered [grossly] reckless or otherwise committed with the [specific] intent of improperly avoiding payment of [a] claim." *O'Donnell,* 734 A.2d at 910. Viewed in this light, "cases in which an insurer may be held liable [for post-litigation misconduct] will be rare indeed." *Givens v. Mullikin ex rel. Estate of McElwaney,* 75 S.W.3d 383, 396 (Tenn.2002).

The decision in *Givens* illustrates the type of egregious defense tactics that could support a third-party bad faith action against an insurer based upon post-litigation conduct. During the plaintiff's action against a tortfeasor for injuries sustained in an automobile accident, substitute defense counsel engaged in the following egregious discovery misconduct:

According to the plaintiff, as soon as Allstate hired the Richardson Firm, the Firm began the discovery process anew to harass her, to cause her to suffer unnecessary expense, and to "weaken [her] resolve to pursue the suit to the extent that she [would] abandon it." The Richardson Firm is first alleged, as an agent of Allstate [and the tortfeasor], to have submitted an excessive number of interrogatories, totaling about 237 questions and subparts, even though it already possessed much of the information requested by the interrogatories. Although the plaintiff asserts that she objected to the initial submission of interrogatories by the Richardson Firm, she relates that the trial court overruled her objection.

The plaintiff also alleges that the Richardson Firm deposed her for a second time, subjecting her to "intense questioning about every aspect of her social, educational, employment, and medical history." Lasting about eight hours, this second deposition is alleged to have inquired as to whether the plaintiff "had been sleeping with the Defendant McElwaney," and as to "every ailment with which [she] has ever been beset, no matter how trivial." The plaintiff was also called upon to furnish the names of every doctor, dentist, and other healthcare professional who treated her for these ailments.

Further, the Richardson Firm is alleged to have issued more than seventy discovery subpoenas to various records custodians. Despite knowing that many of these records possessed no relevance to the issues in the plaintiff's suit, the Richardson Firm is alleged to have sent subpoenas to (1) "every custodian for every healthcare professional who was suspected ... to have rendered treatment to the plaintiff at any time during her life," including her psychologist, her obstetrician/gynecologist, and others; (2) every "hospital in Memphis and Chattanooga (where the plaintiff once lived), even though in many instances[,] the Richardson Firm had no reason to believe that the Plaintiff had received

treatment there"; (3) every employer for whom the plaintiff has ever worked; (4) every automobile repair agency to which the plaintiff's automobile has ever been taken; and (5) every insurance company that has written a policy of insurance for the plaintiff.

*Givens,* 75 S.W.3d at 391–392. The Supreme Court of Tennessee held that the above conduct could support a bad faith claim against the insurer to the extent that the insurer had knowledge of the conduct.[3]

In the instant case, we were not asked to determine whether Mr. Barefield's allegations of misconduct by defense counsel, in the underlying legal malpractice action, could support a bad faith claim against the insurer. Because this case is before this Court on a certified question, the majority opinion simply recognized a cause of action, without examining the merits of Mr. Barefield's evidence. In my judgment, the purported misconduct by defense counsel falls extremely short of conduct that would support a bad faith cause of action against the insurer. The record presented in this matter did not contain a scintilla of evidence showing any type of misconduct by defense counsel, let alone egregious misconduct. All that occurred in this case was routine settlement negotiations. This situation is exactly the type of situation wherein trial courts must grant summary judgment.

The instant case and the *Rose* opinion involved third-party bad faith actions against insurers. However, nothing in either decision limits this new cause of action to third-party litigants, which suggests that the cause of action is also maintainable as a first-party bad faith action. With this point in mind, I will present a few case illustrations of conduct that has been deemed sufficient or insufficient to support a first-party bad faith action against an insurer for defense counsel misconduct.

In *O'Keefe v. Safeco Insurance Co. of America,* 55 Or.App. 811, 639 P.2d 1312 (1982), the insured filed a bad faith action against her insurer based upon defense counsel's conduct in defending the insured in a personal injury case.[4] Specifically, the insured argued that defense counsel: (a) failed to take the plaintiff's deposition; (b) failed to obtain the plaintiff's medical records; (c) failed to obtain the plaintiff's financial records; (d) failed to take the deposition of the plaintiff's doctors; and (e) failed to secure adequate medical consultation for the benefit of the insured. A jury returned a verdict for the insured, and the insurer appealed. The appellate court found that a cause of action could be maintained against the insurer for defense counsel's conduct. However, the appellate court reversed the verdict based upon an erroneous jury instruction. In remanding the case for a new trial the appellate noted that "[t]here was ... adequate evidence of [the insurer's] negligence." *O'Keefe,* 639 P.2d at 1315. *See Boyd Bros. Transp. Co., Inc. v. Fireman's Fund Ins. Cos.,* 729 F.2d 1407, 1410 (11th Cir.1984) ("[W]e are dealing with an attorney who, no doubt aware that his client the insurer apparently owed nothing under the policy, accordingly elected to perform his duty to his client the insured at best haphazardly."); *Majorowicz v. Allied Mut. Ins. Co.,* 212 Wis.2d 513, 569 N.W.2d 472, 478 (1997) ("Other than obtaining medical records, the defense did little investigation or discovery with respect to what [plaintiff's] medical experts were going to say in the case.").

Similarly, *Sims v. Travelers Insurance Co.,* 16 P.3d 468 (Okla.Civ.App.2000), the insureds brought an action against the insurer to recover underinsured motorist and medical benefits. During that action, the insureds filed a bad faith cause of action for litigation misconduct. The trial court entered partial summary judgment in favor of

---

**3.** During my research I was unable to find any other judicial decision addressing the issue of misconduct by an insurer in a third-party bad faith action. This is no doubt attributable to the fact that only a very few states recognize a statutory third-party bad faith cause of action.

**4.** The insured died, and her estate prosecuted the action against the insurer.

the insurer on the bad faith claim. The court of appeals affirmed as follows:[5]

> The [insureds'] complaints were that the lawyers for [the insurer] had treated [them] as adversaries; filed motions to dismiss; objected to discovery; did not take depositions at the times the [insureds] offered to produce witnesses for deposition; misdocketed meetings; and, rejected the [insureds'] request for mediation.... [W]e find the litigation conduct alleged here cannot be the basis for a bad faith action.

*Sims*, 16 P.3d at 471.

Additionally, in *Zurich American Insurance Co. v. ABM Industries, Inc.*, 265 F.Supp.2d 302 (S.D.N.Y.2003), an insurer filed a declaratory judgment action seeking a determination of the extent of coverage for business interruption losses suffered by the insured-a janitorial service that had serviced premises in the World Trade Center. The insured filed a counterclaim. Subsequent to discovery, the insured filed a motion to amend its pleadings to state a bad faith cause of action for post-litigation misconduct. The district court judge denied the motion to amend and gave the following reasons:[6]

> [the insured's] motion to amend its counterclaim to add a claim that [insurer] engaged in bad faith during the course of the litigation must be denied. The purported claim is simply a hodge podge of untimely, immaterial, and/or futile nit-picks. It asserts, for example, that [the insurer] has improperly asserted insurance coverage positions inconsistent with the interpretation of the Policy offered by [the insurer's] own witnesses ... whereas, assuming arguendo this were true, it would be entirely permissible. The proposed counterclaim also alleges that [the insurer] improperly obtained discovery before the lawsuit commenced under the guise of seeking to adjust its claim, ...whereas, assuming arguendo any such behavior occurred and was improper, it should properly have been addressed by [the insured] bringing a motion for preclusion and sanctions at the outset of the litigation....
>
> Without multiplying examples further, the conclusion is obvious that [the insured's] belated attempt to dress up its discovery and other pre-trial disputes as a new counterclaim must fail. Moreover, even if the potpourri of allegations that [the insured] includes in its proposed new counterclaim had greater merit than they do, their joinder at this stage with this otherwise straightforward insurance coverage dispute could only create confusion and consequent prejudice, and thus the Court would still be obliged to deny the motion to amend.

*Zurich*, 265 F.Supp.2d at 309–10.

Moreover, in *Krisa v. Equitable Life Assurance Soc.*, 109 F.Supp.2d 316 (M.D.Pa. 2000), the insurer denied disability benefits to the insured. The insured thereafter filed a complaint against the insurer. When that case was resolved, the insured filed a bad faith action against the insurer based upon litigation conduct in the first case.[7] The insurer moved to strike and dismiss the bad faith claim. The district judge denied the motion as follows:

> In the instant case, [the plaintiff] is advancing bad faith claims based on more than discovery abuses. Specifically, [the plaintiff] "alleges that [the defendant] wrongly responded to plaintiff's Complaint in [the first action] with a counterclaim asserting, among other things, that plaintiff had committed fraud in his applications to [the defendant] for disability insurance." [The plaintiff] "further alleges that [the defendant's] allegations were false, baseless and fraudulent...." [The plaintiff] has asserted more than just discovery abuses on the part of [the defendant]. Moreover, in light of the policy of liberal construction of statutes so as to effectuate the statute's purpose and the Pennsylvania Superior Court's determination "that the conduct of an insurer during the pendency of litiga-

---

**5.** Other issues were involved in the case that are not relevant to my discussion.

**6.** Other issues not relevant here were also decided in the opinion.

**7.** There were other causes of action stated, but only the bad faith claim is presented here.

tion may be construed as evidence of bad faith under ..." [the plaintiff's] claims are not barred by Pennsylvania law. Accordingly, because [the plaintiff] has asserted facts from which a jury could conclude that [the defendant] used litigation in bad faith to avoid insurance obligations, [the defendant's] motion to strike and dismiss Count II will be denied.

*Krisa,* 109 F.Supp.2d at 321.

Finally, in *General Refractories Co. v. Fireman's Fund Ins. Co.,* 2002 WL 376923 (E.D.Pa.2002), *aff'd in part and rev'd in part,* 337 F.3d 297, 302 (3d Cir.2003), the insureds filed a bad faith action against the insurer based upon conduct in an earlier coverage action.[8] Some of the conduct alleged in the complaint included: (1) a pattern of delay, stonewalling, deception, obfuscation and pretense; (2) intentionally withholding critical documents; (3) ignoring court orders; (4) testifying falsely at depositions, with litigation counsel fully aware of the false testimony; (5) misrepresenting facts to the trial court and opposing counsel; (6) providing incomplete responses, unreasonable objections, unfounded claims of privilege and intentionally incomplete privilege logs in response to reasonable and relevant requests; (7) using an overly broad, clearly untenable theory of privilege to conceal the knowledge, activity and intent which formed the basis of the insurance coverage action; (8) actively hiding highly probative documents while moving for summary judgment on the issues to which the hidden documents related; (9) using hidden documents during a deposition; (10) continuing to locate hundreds of documents that should have been produced or put on privilege logs, each time claiming that they had just been found; (11) engaging in obdurate conduct, including actions demonstrating an attempt to obstruct the discovery process and (12) encouraging witnesses to provide false and misleading testimony.[9] The insurer moved to dismiss the bad faith

claim as failing to state a cause of action. The district court judge denied the motion and stated the following:

> Plaintiffs ... base their insurance bad faith claim on more than just discovery abuses. The Complaint also alleges that Fireman's Fund made misrepresentations to the court and filed abusive motions during the Insurance Coverage Action. Since Plaintiff's cause of action for insurance bad faith is not entirely founded on Defendants discovery tactics, the Court cannot say, at this time, that Plaintiffs cannot prove any set of facts which would entitle them to relief on Count I of the Complaint. Consequently, the Motion to Dismiss will be denied with respect to Count I of the Complaint.

*General Refractories,* 2002 WL 376923 at*3.

## C. Use of Post-litigation Misconduct that is not Actionable as Evidence in Pre–Litigation Conduct Bad Faith Case.

The final issue I wish to address concerns the admissibility of post-litigation misconduct evidence that is insufficient to sustain an independent bad faith cause of action. The general rule in other jurisdictions on this issue is that, "while evidence of an insurer's litigation conduct may, in some rare instances, be admissible on the issue of bad faith, such evidence will generally be inadmissible, as it lacks probative value and carries a high risk of prejudice."[10] *Timberlake Const. Co. v. U.S. Fid. & Guar. Co.,* 71 F.3d 335, 341 (10th Cir.1995). The decision in *Palmer v. Farmers Insurance Exchange,* 261 Mont. 91, 861 P.2d 895 (1993), fully addressed the general rule as follows:

> Several courts have considered whether evidence of an insurer's conduct during litigation of the underlying suit is admissible in a subsequent bad faith action. After examining the reasoning of courts that have considered the issue, we conclude that the continuing duty of good faith does

**8.** Other parties and issues were involved, but are not relevant here.

**9.** The complaint allegations are set out in the appellate decision. *See General Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 302 (3d Cir.2003).

**10.** Obviously this general rule has no application to a bad faith action that is based exclusively on post-litigation misconduct. In the latter situation such evidence is presumptively admissible.

not necessarily render evidence of an insurer's post-filing conduct admissible. Indeed, courts rarely should allow such evidence and we have adopted a balancing test for those rare circumstances.

Public policy favors the exclusion of evidence of an insurer's post-filing litigation conduct in at least two respects. First, permitting such evidence is unnecessary because during the initial action, trial courts can assure that defendants do not act improperly. Next, and more importantly, the introduction of such evidence hinders the right to defend and impairs access to the courts.

The Rules of Civil Procedure control the litigation process and, in most instances, provide adequate remedies for improper conduct during the litigation process. Once the parties have assumed adversarial roles, it is generally for the judge in the underlying case and not a jury to determine whether a party should be penalized for bad faith tactics.

An attorney in litigation is ethically bound to represent the client zealously within the framework provided by statutes and the Rules of Civil Procedure. These procedural rules define clear boundaries of litigation conduct. If a defense attorney exceeds the boundaries, the judge can strike the answer and enter judgment for the plaintiff, enter summary judgment for the plaintiff, or impose sanctions on the attorney.... The most serious policy consideration in allowing evidence of the insurer's post-filing conduct is that it punishes insurers for pursuing legitimate lines of defense and obstructs their right to contest coverage of dubious claims....

Allowing evidence of litigation strategies and tactics would expose the insurer's entire defense in a coverage action to scrutiny by the jury, unless the insurer won the underlying suit. The jury then, with the assistance of hindsight, and without the assistance of insight into litigation techniques, could "second guess the defendant's rationales for taking a particular course." In addition, the jury could consider evidence of the defendant's litigation strategy and tactics without any showing that the insurer's conduct was technically improper. Thus, insurers would be reluctant to contest coverage of questionable claims.

. . . .

To permit evidence of insurers' litigation strategies and tactics is to impede insurers' access to the courts and right to defend, because it makes them reluctant to contest coverage of questionable claims.... Public policy dictates, therefore, that courts must use extreme caution in deciding to admit such evidence even if it is relevant to the insurer's initial decision to deny the underlying claim.

This brings us to another crucial point, the relevance of the insurer's post-filing conduct. In general, an insurer's litigation tactics and strategy in defending a claim are not relevant to the insurer's decision to deny coverage. Indeed, if the insured must rely on evidence of the insurer's post-filing conduct to prove bad faith in denial of coverage, questions arise as to the validity of the insured's initial claim of bad faith....

After the onset of litigation, an insurer begins to concentrate on supporting the decisions that led it to deny the claim. The insurer relies heavily on its attorneys using common litigation strategies and tactics to defend against a debatable claim. Consequently, actions taken after an insured files suit are at best marginally probative of the insurer's decision to deny coverage.

In some instances, however, evidence of the insurer's post-filing conduct may bear on the reasonableness of the insurer's decision and its state of mind when it evaluated and denied the underlying claim. Therefore, we do not impose a blanket prohibition on such evidence.

We believe the correct approach is to strike a balance between deterring improper conduct by the insurer and allowing insurers to defend themselves against spurious claims. Rule 403 provides for that balance. When the insurer's post-filing conduct has some relevance, the court must weigh its probative value against the inherently high prejudicial effect of such

evidence, keeping in mind the insurer's fundamental right to defend itself.

*Palmer*, 861 P.2d at 913–16 (internal citations omitted). *See Southerland v. Argonaut Ins. Co.*, 794 P.2d 1102, 1106 (Colo.App.1990) (permitting post-litigation conduct by insurer to be used as evidence to prove a bad faith claim); *Gooch v. State Farm Mut. Auto. Ins. Co.*, 712 N.E.2d 38, 42 (Ind.App.1999) (same); *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1527 (11th Cir.1985) (same).

In my judgment, the decision in *Palmer* presents the approach that should be used by trial courts in West Virginia when deciding whether to admit evidence of post-litigation misconduct in a bad faith action premised upon pre-litigation conduct. That is, trial courts should apply "Rule 403 to determine whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice." *Coleman v. Sopher*, 201 W.Va. 588, 600, 499 S.E.2d 592, 604 (1997).[11]

The final point I wish to make is that trial courts must distinguish ¡allegations of an insurer's post-litigation misconduct from post-litigation conduct. As I have suggested, a balancing test should be used when considering the introduction of evidence of post-litigation misconduct. This balancing test is inapplicable to mere post-litigation conduct of an insurer. Evidence of an insurer's post-litigation conduct that does not demonstrate any impropriety is irrelevant and should not be admitted in a claim for bad faith. A case illustrating this final point is *O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901 (Pa.Super.1999).

In *O'Donnell*, the plaintiff's home was allegedly burglarized. The plaintiff submitted a claim to the insurer to recover the cost of items allegedly stolen from her home and damaged. During the insurer's investigation of the claim, the insurer found numerous inconsistencies in the information pertaining to lost and damaged items. As a result of the insurer's delay in providing coverage for her claim, the plaintiff filed a breach of con-

tract and bad faith action against the insurer. The case went to trial, and the jury returned a verdict in favor of the insurer. In her appeal, the plaintiff assigned error to the trial court's refusal to instruct the jury that it could consider the insurer's misconduct after the litigation commenced.

The opinion in *O'Donnell* set out the following misconduct evidence that the plaintiff wanted the jury to consider:

> At trial, Appellant claimed that Allstate's bad faith conduct in investigating her claim involved "dilatory tactics, requesting unnecessary and frivolous information and requesting information which had previously been submitted." Appellant raises two instances occurring during the process of discovery which, she argues, should have been considered by the jury. Specifically, without much more elaboration, Appellant claims that Allstate acted in bad faith by propounding interrogatories requesting information "regarding repairs and renovations to [the] property, its foundation and the plumbing contained therein." These inquiries, according to Appellant, are "frivolous" and fail to further Allstate's investigation of her claim. She also characterizes as bad faith Allstate's failure either to accept or deny her claim after she "submitted to a lengthy deposition."
>
> Appellant baldly asserts that because "Allstate had everything it needed in its possession to either accept or deny the claim, yet never did ... [t]his conduct is in bad faith." This argument seems to suggest that because Allstate failed to accept or deny her claim after conducting a lengthy investigation prior to the commencement of Appellant's suit, any action on the part of Allstate in requesting additional information during the pendency of trial is in bad faith.

*O'Donnell*, 734 A.2d at 907.

After reviewing the above evidence of purported misconduct, the opinion in *O'Donnell* held:

> confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

---

**11.** Rule 403 of the West Virginia Rules of Evidence provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

As a matter of law, the evidence presented by Appellant of Allstate's conduct during the course of litigation does not constitute bad faith and, therefore, such evidence was properly excluded from the jury's consideration.

. . . .

In the absence of any evidence which demonstrates that Allstate was motivated by a dishonest purpose or ill motive, or otherwise breached it[s] fiduciary or contractual duty by utilizing the discovery process to conduct an improper investigation, we must reject Appellant's attempt to equate the propounding of interrogatories with the type of bad faith investigative practices actionable [for a bad faith claim].

*O'Donnell,* 734 A.2d at 907–909.

In view of the foregoing, I concur in the majority opinion.

Chief Justice MAYNARD, concurring, in part, and dissenting, in part.

In *Barefield,* I concur with the majority's holding that an insurer cannot be held liable under the West Virginia Unfair Trade Practices Act for the actions of a defense attorney when the attorney's strategy and tactics are a result of his or her independent, professional discretion. However, I dissent to the holding that the conduct of an insurer during the pendency of a lawsuit may support a cause of action under the Act.

Similarly, in *Rose,* I concur with reversing the circuit court's order to the extent that it ruled that a defense attorney, hired by an insurance company to defend the interests of an insured in a liability matter, is subject to the provisions of the Unfair Trade Practices Act. However, I dissent to affirming the circuit court's ruling that an insurance company can be held liable, under certain circumstances, for violations of the Act by a defense attorney employed by the insurance company to defend an insured.

Both *Barefield* and *Rose* are third-party statutory bad faith cases. As I previously made clear, I do not believe that a private cause of action, and especially a third-party cause of action, should exist under the Unfair Trade Practices Act. The Act itself does not expressly indicate that it supports a private cause of action. Rather, this Court, many years before any of its present members arrived, in a perfect example of judicial legislation, created such a cause of action from whole cloth. *See Jenkins v. J.C. Penney Cas. Ins. Co.,* 167 W.Va. 597, 280 S.E.2d 252 (1981), *overruled on other grounds by State ex rel. State Farm Fire & Cas. Co. v. Madden,* 192 W.Va. 155, 451 S.E.2d 721 (1994). As I stated in footnote 10 of *State ex rel. Medical Assurance v. Recht,* 213 W.Va. 457, 469, 583 S.E.2d 80, 92 (2003), among the small minority of states that recognize a private cause of action arising from their unfair claim settlement statutes,

> only a handful recognize *third-party* bad faith claims[.] According to [*State ex rel. Allstate Ins. Co. v.] Gaughan,* [203 W.Va. 358], 369, n. 15, 508 S.E.2d [75], 86 [1998], "[m]ost courts which have considered a third-party bad faith action have not allowed such a third-party claim against a tortfeasor's insurer." (Citation omitted). This is in accord with Paul R. Rice, *A Quasi–Attorney–Client Privilege? West Virginia's Mislabeled Fiduciary Duty Exception,* 101 W.Va. L.Rev. 311, 314 (1998) which says, "[b]ecause the third-party action involves a plaintiff to whom the insurance company did not owe a contractual duty under the insurance policy, most state jurisdictions that have addressed the issue have refused to find an implied statutory duty under legislative schemes similar to those in West Virginia." (Footnote omitted).

Because I do not believe that this Court should have created third-party statutory bad faith claims, I disagree with the expansion of such a cause of action by the majority in the instant cases.

The fact is that third-party bad faith claims, besides being wholly unsupported in statutory law, simply are a bad idea. First, they are unnecessary. Insurers already have a contractual and implied duty of good faith and fair dealing to their insureds to settle claims against the insureds. In Syllabus Point 2 of *Shamblin v. Nationwide Mut. Ins. Co.,* 183 W.Va. 585, 396 S.E.2d 766 (1990), this Court held:

Wherever there is a failure on the part of an insurer to settle within policy limits where there exists the opportunity to settle and where such settlement within policy limits would release the insured from any and all personal liability, the insurer has prima facie failed to act in its insured's best interest and such failure to so settle prima facie constitutes bad faith toward its insured.

Thus, when an insurer refuses to settle with a third-party claimant and, as a result, the claimant is awarded a verdict in a personal injury trial against the insured in excess of the insured's policy limits, the insurer is prima facie guilty of bad faith toward its insured. At that point,

It will be the insurer's burden to prove by clear and convincing evidence that it attempted in good faith to negotiate a settlement, that any failure to enter into a settlement where the opportunity to do so existed was based on reasonable and substantial grounds, and that it accorded the interests and rights of the insured at least as great a respect as its own.

Syllabus Point 3, *Shamblin, supra.* Accordingly, insurers have a powerful incentive to settle claims of third-party claimants absent the bringing of third-party bad faith actions.

Second, third-party bad faith claims create potentially conflicting duties of insurers toward both third-party claimants and their own insureds, to the detriment of those insureds. As noted above, insurers have both a contractual duty and an implied duty of good faith and fair dealing to their insureds. In contrast, the relationship between an insurer and a third-party claimant is adversarial. "[T]hat the insurer is the representative of the insured logically imports that the third party tort claimant's status as the adversary of the insured renders him, ipso facto, the adversary of the insured's agent." *Linscott v. State Farm Mutual Auto. Ins. Co.,* 368 A.2d 1161, 1163–64 (Me.1977). "[T]he insurer stands in the shoes of the insured in dealing with the victim." *Long v. McAllister,* 319 N.W.2d 256, 262 (Iowa 1982). Nevertheless, in recognizing third-party bad faith claims, this Court illogically mandates that

an insurer owes competing duties to both insureds and third-party claimants. However, "[n]o servant can serve two masters." [1]

The problem of competing duties is greatly exacerbated by the majority's decisions in the instant cases. If an insurer, as we have seen, is an adversary of a third-party claimant in the settlement process, it is even more of an adversary once litigation is instituted against its insured. Yet, the majority says that insurers now are potentially liable to third-party claimants for every decision they make in the course of defending their insureds, and they may be liable for the actions of the attorneys they hired to represent the insureds. While the majority attempts to distinguish the actions of insurers from the actions of defense attorneys, acting independently, such a distinction in practice is a chimera—a vain and idle fancy. Now third-party claimants simply will allege in their complaints wrongful failure to settle both pre—and post-litigation. Claimants will further aver that the insured's defense attorney was not acting independently of the insurer, but that the insurer "breached its duties under the Act by knowingly encouraging, directing, participating in, relying upon, or ratifying wrongful litigation conduct of a defense attorney hired by the insurance company to represent an insured." Syllabus Point 6, *Rose.* Consequently, all litigation decisions made by the insurer and the insured's defense attorney will be open to the scrutiny of the courts. Such a result is appalling in a justice system such as ours where every party is due zealous representation. Our system is an adversary system. Such systems, when they are allowed to work properly, are great mechanisms to find the truth and ensure fair trials. But when one adversary party is punished simply for being adversarial, the system breaks down and degenerates into an unfair and biased exercise in bullying. It is about as fair as a boxing match where one boxer has a hand tied behind his back.

Other courts have recognized the problems that arise when post-litigation conduct is

---

1. Luke 16:13.

made the subject of bad faith claims against insurers.

Allowing litigation conduct to serve as evidence of bad faith would undermine an insurer's right to contest questionable claims and to defend itself against such claims. As a district court in this Circuit aptly noted, permitting allegations of litigation misconduct would have a "chilling effect on insurers, which could unfairly penalize them by inhibiting their attorneys from zealously and effectively representing their clients within the bounds permitted by law." *International Surplus Lines Ins. Co. v. University of Wyoming Research Corp.,* 850 F.Supp. 1509, 1529 (D.Wyo. 1994), *aff'd,* 52 F.3d 901 (10th Cir.1995). Insurers' counsel would be placed in an untenable position if legitimate litigation conduct could be used as evidence of bad faith. Where improper litigation conduct is at issue, generally the Federal Rules of Civil Procedure provide adequate means of redress, such as motions to strike, compel discovery, secure protective orders, or impose sanctions. *See id.* at 1528–29.

*Timberlake Const. Co. v. U.S. Fidelity and Guar. Co.,* 71 F.3d 335, 341 (10th Cir.1995). *See also Federated Mut. Ins. Co. v. Anderson,* 297 Mont. 33, 42, 991 P.2d 915, 922 (1999) ("Public policy favors the exclusion of [an insurer's postfiling conduct] under normal circumstances because it can hinder the right to defend and can impair access to the courts; therefore, courts must use extreme caution in deciding to admit such evidence even if relevant." (Citation omitted.)); *Howard v. State Farm Mut. Auto. Ins. Co.,* 316 S.C. 445, 448, 450 S.E.2d 582, 584 (1994) ("Evidence that arises after the denial of the claim is not relevant to the propriety of the conduct of the insurer at the time of its refusal." (Citation omitted.)).

In sum, the majority's holdings that post-litigation conduct of an insurer may support a cause of action under the Unfair Trade Practices Act and that an insurer is potentially liable for the actions of a defense attorney it hired to represent the insured are devoid of common sense. They infringe on the constitutional right of access to the courts of insurers and insureds by seriously compromising their ability to defend themselves in actions brought by third-party claimants. Actually, I believe we have so crippled and hobbled insureds in these cases that their constitutional right of access to the courts has been denied. In effect, the de facto rule now is that parties in litigation, *with the exception of insurers and insureds,* have a right to zealous representation.

Also, the majority opinions are blatantly anti-consumer (insurance consumer) in that they decrease the value of insurance policies by reducing the contractual duty of insurers to defend their insureds in litigation. Any challenge by an insured to the representation of his insurer-provided lawyer can now be answered with the claim that the insurer had an equal duty to the insured's adversary, the third-party claimant. Finally, by increasing frivolous third-party bad faith litigation and concomitantly the cost of litigation to insurance companies, the majority opinion will have the effect of increasing the cost of purchasing insurance for all West Virginia consumers. That means premiums will increase, and premiums are paid *only* by consumers.

For all of these reasons, I respectfully dissent to the majority's holdings that post-litigation conduct of an insurer may support a statutory bad faith action, and that an insurer may be liable for the actions of a defense attorney hired by the insurance company to represent its insured.

ALBRIGHT, Justice, concurring.

Two of my colleagues have written separately in this case on matters which I believe invite further discussion given the importance of this case and its companions, *Rose v. St. Paul Fire and Marine Insurance Co.,* 215 W.Va. 250, 599 S.E.2d 673 (2004), and *Madden v. Allstate Insurance Company,* No. 31392, —— W.Va. ——, 601 S.E.2d 25 (June 10, 2004).

In his separate opinion, concurring in part and dissenting in part to the decision in this case and the decision in *Rose v. St. Paul Fire and Marine Insurance,* Chief Justice Maynard articulates concerns about the vitality of our adversarial system because of those decisions. In particular, the Chief Justice questions the wisdom of (1) allowing the prosecu-

tion of third-party bad faith claims against insurers for conduct in the course of litigation, as approved in the instant case, and (2) allowing a third-party bad faith claim to be prosecuted against an insurer for unlawful conduct effectuated by a defense attorney employed to defend an insured, as approved in *Rose.*

The first basis upon which Chief Justice Maynard attacks both decisions is his opposition, on general principles, to the existence of statutory third-party bad faith claims. *See* W.Va.Code § 33–11–4(9) (2002) (Repl. Vol 2003). That type of civil action, as the Chief Justice acknowledges, was first created by this Court in 1981, long before the arrival of any of its present membership.[1] More importantly, however, no party to these proceedings assigned as error the existence of such a statutory cause of action. Without question, an attack on the wisdom of continuing to permit this particular cause of action contributes nothing to the task with which this Court was confronted by the issues presented in the instant case or in *Rose.*

Beyond lamenting the existence of a private cause of action for third-party bad faith claims and suggesting that law created by this Court in *Shamblin v. Nationwide Mutual Insurance Co.,* 183 W.Va. 585, 396 S.E.2d 766 (1990), obviates the need for statutory third-party bad faith claims,[2] the Chief Justice expresses concern over creating "potentially conflicting duties of insurers toward both third-party claimants and their own insureds." In his effort to unduly dramatize this concern, the Chief Justice suggests that "insurers now are potentially liable to third-party claimants for every decision they make in the course of defending their insureds," and suggests that such actions will result in a "party [being] punished simply for being adversarial." The Chief Justice posits further that both decisions infringe upon the constitutional rights of insurers and insureds "by seriously compromising their ability to defend themselves." He further opines that the subject decisions give rise in *every* case

to "the claim that the insurer had an equal duty to the insured's adversary, the third-party claimant." Finally, the author assures us that insurance premiums will inevitably increase as a result of these two decisions.

In my experience, such a soaring flight of rhetoric, often referred to as "parading the horribles," merely serves to obfuscate or divert attention from the true issues deserving consideration and discussion. Moreover, an examination of these "horribles" suggests they are not as dreadful, or as likely to occur, as the Chief Justice would have us believe. Let us look at the principal complaints:

*Conflicting duties owed third-party claimants and insureds:* The duty of an insurer owed a third-party claimant, to avoid acts performed in bad-faith, can hardly be seen as contrary to the like duty not to deal with insureds in bad faith. Certainly, the insurer does not owe any duty to its insured to act in bad faith regarding anything.

*Potentially liable to third-party claimants for every decision made defending insureds:* Only if every decision is tainted with bad faith!

*Party punished for being adversarial:* Only if acting in bad faith!

*Seriously compromising insureds' and insurers' ability to defend themselves:* By requiring insurers to not act in bad faith?

*Claiming that the insurer had an equal duty to the insured's adversary, the third-party claimant:* The only duty equally owed by an insurer to its insured and a third-party claimant is that insurer owes a duty to its insured and a third-party claimant alike *not to act in bad faith.*

*Premiums will rise:* Unfortunately, a likely possibility for customers of insurers who commit acts of bad faith.

While I am reasonably certain that the "parade of horribles" employed by the Chief Justice is merely an exercise in hyperbole, I also appreciate that wholesale abuse of the

---

**1.** *See Jenkins v. J.C. Penney Cas. Ins. Co.,* 167 W.Va. 597, 280 S.E.2d 252 (1981).

**2.** *Shamblin* recognized the duty of good faith that an insurer has to its insured; it did not

address instances involving third-party bad-faith claims where there is no contractual duty between the insurer and the party making a claim.

causes of action authorized by the two opinions at issue might soon bring to reality one or more of those horribles. In my dissenting opinion to *Madden v. Allstate Insurance Company,* 215 W.Va. 705, 601 S.E.2d 25 (2004), I recognized that the legal standards adopted by this Court in bad faith cases for invading the attorney-client privilege under the crime-fraud exception "had opened the door for any practicing lawyer" to undertake the invasion of that privilege in such cases for less than valid reasons. *Id.* at 621, 601 S.E.2d at 44 (Albright, J., dissenting, at *9). Likewise, I respectfully suggest that the bench and bar should both be watchful for groundless and, therefore, completely unwarranted assertions of the causes of action authorized by the majority through this case and *Rose.*

The obvious first line of defense against litigational conduct thought to be improper is found in the various existing rules and sanctions provided by our judicial system. It would be a serious mistake for plaintiffs to routinely file bad faith cases premised on conduct occurring during the course of defending insurance claims that does not clearly rise to the level of demonstrable bad faith. To unduly harass defense counsel and insurers with potential lawsuits alleging bad faith that are substantially without merit could easily lead to the abolition of the statutory cause of action at issue in these two cases—by legislative enactment or by a reversal of the case law recognizing this private cause of action,[3] as Chief Justice Maynard clearly advocates.

The second separate opinion deserving comment is the concurring opinion in this case, *Barefield,* in which Justice Davis selected three issues for elucidation which were not before this Court and which, in my judgment, were not ripe or appropriate for discussion in this certified question case. Although this Court has the authority to reformulate questions properly certified, we do not have the liberty to expound on any concern which we anticipate may arise in rela-

tion to the question. Our reformulation of certified questions is utilized to remove any impediment there may be to fully addressing the specific legal problem to same raised by the question. Reformulation is not a mechanism this Court should use to address every conceivable implication which may develop in proceedings from which the question arose. As we observed in *Bass v. Coltelli,* 192 W.Va. 516, 453 S.E.2d 350 (1994),

> "Only those questions should be certified up before judgment which bring with them a framework sufficient to allow this Court to issue a decision which will be pertinent and inevitable in the disposition of the case below."

*Id.* at 521, 453 S.E.2d at 355, quoting *State, Agency of Transportation v. City of Winooski,* 147 Vt. 649, 520 A.2d 998, 999 (1986).

In hearing a question certified to us by a federal court, as in this case, or by the highest court of another state, we sit under a special statutory grant of jurisdiction. *See* W.Va.Code § 51A–1–1 *et seq.* In such cases, we have before us only a limited record, not one fully developed by trial. We have no judgment to review: We have only the questions posed and, in some instances, the answer proposed by the submitting court. Therefore, addressing issues beyond the substance of the question as certified would no doubt lead to giving "direction" about matters that do not exist in the pending case or unwittingly providing an advantage to one side in the controversy by pronouncing standards, procedures, or other conclusions favorable to one party or another. In her concurring opinion, Justice Davis chose to address the following issues: The applicability of the defense of litigation privilege; the proposition that aggressive defense tactics do not equate to bad faith misconduct; and the use of evidence of misconduct occurring after a suit is filed in the court to sustain an independent bad faith cause of action.[4] While these may well be matters related to cases involving bad faith claims under the

---

**3.** *See Jenkins v. J.C. Penney Cas. Ins. Co.,* 167 W.Va. 597, 280 S.E.2d 252 (1981).

**4.** I have chosen not to use the term "post-litigation misconduct" as it appears the reference concerns conduct occurring after claims have been filed in court rather than after they have been litigated.

Unfair Trade Practices Act, none of these subjects required our attention in order to answer the actual certified questions raised. Those three issues were addressed without the benefit of the litigants' perspective developed in briefs and arguments. Moreover, the legal principles at issue were enunciated in a factual vacuum. Simply put, I believe this Court should strive to limit its certified question opinions to the specific issues raised by the questions certified. I respectfully submit that addressing issues beyond those raised by the certified questions serves no purpose with regard to clarifying the status of the law.

I believe the majority opinion written by Justice Starcher fully and succinctly answers the questions posed by the federal district court. Accordingly, I concur.